## UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

## Fernando M. BROWN
## Chief Machinery Technician (E-7), U.S. Coast Guard

## CGCMSP 25002
## Docket No. 001-69-21

## 6 June 2022

Special court-martial sentence adjudged on 21 October 2020.

| | |
|---|---|
| Military Judge: | CAPT Ted R. Fowles, USCG |
| Appellate Defense Counsel: | Mr. Brian A. Pristera, Esq. |
| | Mr. Scott Hockenberry, Esq. (argued) |
| | CDR Jeffrey G. Janaro, USCG |
| Appellate Government Counsel: | LT Tae W. Chon, USCG |
| | LCDR Daniel Halsig, USCG (argued) |

## BEFORE
## McCLELLAND, BRUBAKER & MANNION
Appellate Military Judges

BRUBAKER, Judge:

A military judge sitting as a special court-martial convicted Appellant, contrary to his pleas, of three specifications of disrespect toward a petty officer and one specification of violation of a lawful general order prohibiting sexual harassment, in violation of Articles 91 and 92, Uniform Code of Military Justice (UCMJ). The court sentenced Appellant to reduction to E-4, a reprimand, and restriction for thirty days. The convening authority approved the sentence. Judgment was entered accordingly. Approving Appellant's timely application, the Judge Advocate General, U.S. Coast Guard, sent the case to this Court pursuant to Article 69(d), UCMJ.

Before this Court, Appellant asserts the following errors:

(1) The evidence supporting Appellant's convictions for disrespect toward a petty officer is legally insufficient because the charged conduct did not occur within the sight or hearing of the respective victims and the charged deportment did not occur in the presence of the respective victims.[1]

(2) The military judge acquitted Appellant of violating a lawful general order prohibiting sexual harassment by excepting language necessary for guilt from the specification.

(3) The evidence supporting Appellant's conviction for violating a lawful general order prohibiting sexual harassment is legally insufficient because there were insufficient attendant circumstances linking the charged conduct to a military workplace.

We hold that sending a disrespectful text message directly to the victim is actionable under Article 91, UCMJ. With this, we conclude there is legally sufficient evidence to support the disrespect convictions. We agree with Appellant, however, that the military judge excepted language from the sexual harassment specification that was necessary for guilt, effectively acquitting Appellant of the specification. We therefore affirm the disrespect convictions, set aside the sexual harassment conviction, and reassess the sentence. This moots the final issue of whether there was legally sufficient evidence to support the sexual harassment conviction.

**Background**

The Chief's Mess of USCGC *Polar Star* had a text message group comprising all the cutter's senior enlisted personnel to coordinate, maintain camaraderie while in drydock, and pass work-related information. Appellant sent several offensive texts to this group, including the target of each. In one, he sent a photograph of a fellow chief petty officer, adding a crudely-drawn penis and scrotum to his hard hat. In another, he belittled the sexual orientation of a fellow chief petty officer by sending the group a high school yearbook photograph of her, adding the caption, "Voted most likely to steal your bitch." Pros. Ex. 5 at 1. Finally, he ridiculed a senior chief who was the senior member of the Mess by sending a picture of a scantily-clad man with a large Dallas Cowboys image on his back, adding the caption, "Found out why [the senior chief] missed chiefs call." Pros. Ex. 9 at 1.

---

[1] We heard oral argument on this issue.

In a separate incident, Appellant sent an unsolicited video to Petty Officer Third Class (PO3) C.L. The video depicted a man holding a candy wrapper and unwrapping it to reveal his penis, with the caption, "Heard you have a sweet tooth." PO3 C.L. was, at the time, attending "A" School for her rating, but had previously served as a non-rate seaman aboard the *Polar Star* with Appellant.

### Disrespect of a Petty Officer

Whether there is legally sufficient evidence to support a conviction is a question of law that we review de novo. *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019). The standard for legal sufficiency—which "involves a very low threshold to sustain a conviction"—is whether, "viewing the evidence in the light most favorable to the prosecution" and drawing "every reasonable inference from the evidence of record in favor of the prosecution," "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (cleaned up). The phrase "beyond a reasonable doubt" does not "mean that the evidence must be free from any conflict or that the trier of fact may not draw reasonable inferences from the evidence presented." *Id*.

Appellant asserts the evidence is legally insufficient to support his convictions for disrespect in two ways: (1) Article 91, UCMJ, does not cover disrespect by remote means of communication, such as a text message; and (2) because the Government specifically alleged he was disrespectful in deportment, as opposed to in language, it was required, but failed, to prove that the acts were done "in the presence" of the victims. We disagree and hold that Article 91 is broad enough to encompass disrespectful text messages sent directly to the victim, whether they are disrespectful in language or in deportment.

In relevant part, Article 91, provides, "Any warrant officer or enlisted member who . . . treats with contempt or is disrespectful in language or deportment toward a warrant officer, noncommissioned officer, or petty officer, while that officer is in the execution of his office[,] shall be punished as a court-martial may direct." Article 91, UCMJ.

In Part IV of the Manual for Courts-Martial, the President lists the following elements for this offense:

    (1) That the accused was a warrant officer or enlisted member;

    (2) That the accused did or omitted certain acts, or used certain language;

    (3) That such behavior or language was used toward and within sight or hearing of a certain warrant, noncommissioned, or petty officer;

    (4) That the accused then knew that the person toward whom the behavior or language was directed was a warrant, noncommissioned, or petty officer;

    (5) That the victim was then in the execution of office; and

    (6) That under the circumstances, the accused, by such behavior or language, treated with contempt or was disrespectful to said warrant, noncommissioned, or petty officer.

*Manual for Courts-Martial*, United States, pt. IV, para. 17.b.(3) (2019 ed.) (*MCM*).

> The presidential explanation of "disrespect" provides:
>
> Disrespectful behavior is that which detracts from the respect due the authority and person of [an] officer. It may consist of acts or language, however expressed . . . . Disrespect by words may be conveyed by abusive epithets or other contemptuous or denunciatory language. Truth is no defense. Disrespect by acts includes neglecting the customary salute, or showing a marked disdain, indifference, insolence, impertinence, undue familiarity, or other rudeness in the presence of the superior officer.

*MCM*, pt. IV, para. 15.c.(2)(b) (cited by para. 17.c.(5)).

We review questions of statutory construction de novo. *United States v. Wilson*, 76 M.J. 4, 6 (C.A.A.F. 2017). "[I]t is axiomatic that in determining the scope of a statute, we look first to its language." *Id.* (cleaned up). "The President has the power to prescribe regulations for trial procedures, including modes of proof, for cases arising under the UCMJ," but "[t]his power does not extend to Part IV of the *MCM*, and we are not bound by the President's interpretation of the elements of substantive offenses." *Id.* (citing Article 36, UCMJ; *United States v. Davis*, 47 M.J. 484, 486 (C.A.A.F. 1998)). Still, when "the President unambiguously gives an accused greater rights than those conveyed by higher sources, this Court should abide by that decision unless it

4

clearly contradicts the express language of the Code." *Davis*, 47 M.J. at 486; *see also United States v. Czeschin*, 56 M.J. 346, 348 (C.A.A.F. 2002).

With that framework in mind, we turn to the question of whether disrespect communicated through remote technology such as a text message is actionable under Article 91, UCMJ. This, it appears, is an issue of first impression.

Appellant urges that "within sight or hearing" plainly connotes "a contemporaneous witnessing, rather than simply an eventual witnessing via remote and non-contemporaneous transmission." Appellant's Br. at 7. As support, he points to historical use of the phrase in other contexts. Appellant's Br. at 7–8 (citing *United States v. Royal*, 2 M.J. 591, 594 (N.C.M.R. 1976) (escape from custody); *United States v. Ream*, 1 M.J. 759, 761 at n.3 (A.F.C.M.R. 1975) (escape from custody); William Winthrop, *Military Law and Precedents*, 307–310 (review 2nd Ed., Gov't Print. Off. 1920) (1895) (contempt of court)). Appellant asks that we apply a similar interpretation. If not, he asks that we declare the phrase ambiguous and grant him relief under the rule of lenity. We decline.

As a starting point, Appellant misapprehends the analytical framework we apply to a presidential interpretation of a statutory crime. Congress, not the President, establishes substantive criminal law. *United States v. Jones*, 68 M.J. 465, 471 (C.A.A.F. 2010) ("Determinations as to what constitutes a federal crime, and the delineation of the elements of such criminal offenses—including those found in the UCMJ—are entrusted to Congress."); *United States v. Tucker*, __ M.J. __, No. 1472, 2022 WL 1042982, at *1 (C.G. Ct. Crim. App. Apr. 7, 2022). To the extent the President has the authority to grant greater rights to a servicemember by excluding certain means of communication from Article 91's reach, he must do so unambiguously. *Davis*, 47 M.J. at 486. Otherwise, we rely on the statute itself.

Article 91 prohibits any contempt or disrespect as long as it is "toward" a certain warrant, noncommissioned, or petty officer while that person is "in the execution of his office." Article 91, UCMJ. On its face, this makes no distinction regarding the means used to convey the contempt or disrespect. As a general principle, "one may be guilty of a crime, where the

prohibited act is committed through the agency of mechanical or chemical means, as by instruments, poison or powder . . . ." *Beausoliel v. United States*, 107 F.2d 292, 297 (D.C. Cir. 1939). By its plain terms, then, Article 91 prohibits any contempt or disrespect—by whatever means, mechanical or otherwise—toward a warrant, noncommissioned, or petty officer who is in the execution of his office at the time of the contempt or disrespect.

So the question becomes: to the extent he has the authority to do so, has the President unambiguously excluded from the ambit of Article 91 expressions of contempt or disrespect conveyed by means of remote technology, such as a cell phone? We think not.

First, it appears that in articulating that behavior or language must be used "within sight or hearing" of the victim, the President is interpreting, not narrowing, the statute. The current *MCM* points to the phrase as an application of the statutory term "toward." *MCM*, pt. IV, para. 17.c.(5) (" 'Toward' requires that the behavior and language be within the sight or hearing of the warrant, noncommissioned, or petty officer concerned."). This is somewhat confusing, because Article 89 (disrespect toward a commissioned officer) also contains the statutory requirement that the behavior or language be "toward" its victim. Yet under Article 89, the behavior or language clearly does not have to be within the victim's sight or hearing. *MCM* pt. IV, para. 15.b.(1); *see also, e.g., United States v. Wilson*, 47 M.J. 152, 153 (C.A.A.F. 1997) (affirming a conviction for using an epithet to describe the victim commissioned officer in a conversation with a third-party officer).

Previous editions of the *MCM*, however, do a better job of shedding light on this. The 1951 *MCM* provided this explanation: "The word 'toward' read in connection with the phrase 'while such officer is in the execution of his office' limits the application of this part of this article to behavior and language within the sight or hearing of the warrant officer, noncommissioned officer, or petty officer concerned." Similarly, going all the way back to 1917—when the *MCM* was issued under the authority of the Secretary of War, not the President—it explained:

> "The phrase 'while in the execution of his office' limits the application of this part of the article to language and behavior within sight or hearing of the noncommissioned officer toward whom it is used; the word 'toward' not being used in the same sense as in [Article of War 63, disrespect toward a commissioned officer]."

*MCM* (1917 ed.), para. 415.

In short, rather than a limiting construction intended to convey greater rights than Article 91 otherwise offers, the provisions in the current *MCM* are a mere adaptation of a long-standing interpretation of the proof necessary to satisfy Article 91's substantive requirements. With this, we avoid reading the President's provisions about Article 91 in a way that would significantly abridge it or frustrate its purpose.

An interpretation that removes electronic communications from the ambit of Article 91 would do both. Communication by remote means has long existed, but in recent years, the use of technology to communicate in the military has exploded. Today, the use of cell phones, electronic mail, videoconferencing, etc., to communicate about and perform military duties is an ever-present part of daily life—indeed, an expectation—up and down the ranks. In other words, servicemembers can, and in today's society increasingly do, use information technology while in the execution of their military office.

As the presidential explanation itself states, the object of Article 91 is "to ensure obedience to [warrant officers', noncommissioned officers', and petty officers'] lawful orders, and to protect them from violence, insult, or disrespect." *MCM*, pt. IV, para. 17.c.(1). It would frustrate this purpose and create a significant gap in Article 91 were the President to excuse all expressions of contempt or disrespect conveyed by means of electronic media.

It is far from unambiguous that he has done so. We see no indication that the President's explanations of Article 91 amount to an invocation of his rulemaking authority under Article 36, UCMJ, to insist that disrespectful behavior or language be, in effect, in person. We hold, instead, that his interpretation that disrespect under Article 91 requires proof that the accused's "behavior

or language was used toward and within sight or hearing of" the victim means, simply, that the accused himself caused the behavior or language to be seen or heard by the victim.

This is a reasonable interpretation. First, although Appellant seems to want to read into the President's interpretation that the *accused* needs to be within sight or hearing of the victim at the time he crafts his disrespect, that is not what it says. Instead, it is the disrespectful *behavior or language* that must be within the victim's sight or hearing. If an accused directly causes disrespectful behavior or language to come within the victim's sight or hearing, this element is plainly met.

Second, contrary to Appellant's assertions, this interpretation in no way undermines Article 91's dual requirements that language or behavior be *toward* the victim *while the victim is in the execution of his office*. It indeed would not vindicate these requirements if, for instance, an accused were liable for a statement to a third party that the victim *eventually* saw or heard (in contrast to disrespect of a commissioned officer under Article 89, *see Wilson*, 47 M.J. at 153). But that has nothing to do with measurements of time or distance between transmission and receipt. It instead is because the accused himself did not place the statement within the victim's sight or hearing. In such a case, it would make no sense—and would likely be impracticable—to base liability on what the victim was doing at the time the accused conveyed the disrespect to the third party. Hence the requirement that the accused directly place behavior or language within the victim's sight or hearing. This vindicates what we believe is the crux of Article 91: preventing disrespect of a warrant, noncommissioned, or petty officer when that person is trying to do his or her job.

Nor, contrary to Appellant's assertion, is it indecipherable to an accused whether a victim is in the execution of office when receiving a communication merely because it is conveyed through electronic means. "An officer is in the execution of office when engaged in any act or service required or authorized by treaty, statute, regulation, the order of a superior, or military usage." *MCM*, pt. IV, para. 15.c.(3)(f) (cited by para. 17.c.(5)). Whether the recipient of a communication is in the execution of his office depends not so much on *when* and *where* he receives it as on *why* and in *what context*. A person can see or hear a message in a private

capacity while in uniform at work (say, while listening to a message from his wife on his personal cell phone), yet see or hear a message in his official capacity while at home in his pajamas (perhaps reading an email from a watch officer about an incident at work). It is not required that an accused know that the victim is in the execution of his office at the time of the disrespect, *see MCM*, pt. IV, para. 17.b, but the context of the communication should be a clear indicator.

Likewise, the President's explanation of "disrespect" does not unambiguously exclude electronic communications from disrespect by deportment—far from it. The explanation provides, "Disrespect by acts includes neglecting the customary salute, or showing a marked disdain, indifference, insolence, impertinence, undue familiarity, or other rudeness *in the presence of the superior officer*." *MCM*, pt. IV, para. 15.c.(2)(b) (cited by para. 17.c.(5)) (emphasis added). Appellant again incorrectly reads this to mean that the *accused* must be in the physical presence of the victim at the time he crafts and sends a disrespectful message. But it is the behavior, not the accused, that we focus on. When an accused directly places rude behavior into the presence of the victim, whether by physical or electronic means, this requirement is met.

Having interpreted Article 91 as properly encompassing disrespectful language or behavior conveyed through electronic means, we readily conclude that Appellant's convictions are supported by legally sufficient evidence. Appellant conveyed disrespectful behavior by delivering a series of pictures he had altered, adding a penis and scrotum to one and captions to the other two. He sent them directly to each victim, as well as others, thus placing this rudeness within their sight and presence. The victims were not just authorized, but expected, to use the Chief's Mess text message group to communicate about work-related matters. Thus, when the victim chief petty officers viewed the messages that Appellant placed within their sight, whether they were at home or aboard the cutter, they were in the execution of their office. Finally, Appellant's acts detracted from the respect due chief petty officers and were therefore disrespectful.

Appellant's acts were just as disrespectful in deportment as if he had used an in-person, work-related forum to hand each victim the pictures in question. That he used electronic means

to deliver them does not relieve him of liability under Article 91. The evidence is legally sufficient.

### Findings by Exception

Appellant was charged with violating a lawful general order "by wrongfully sexually harassing [PO3 C.L.] by sending her an unsolicited digital image of male genitalia while she was attending 'A' school which created an offensive work environment." Charge Sheet. The military judge found him guilty of the specification, except the words "while she was attending 'A' school which created an offensive work environment." R. at 427. Appellant asserts that the excepted words constituted an essential element of the offense and that he was therefore effectively acquitted of the specification. We agree.

"One or more words or figures may be excepted from a specification and, when necessary, others substituted, if the remaining language of the specification, with or without substitutions, states an offense by the accused which is punishable by the court-martial." R.C.M. 918(a)(1), Discussion; *United States v. Ayalacruz*, 79 M.J. 747, 753 (N-M. Ct. Crim. App. 2020); *see also United States v. Smith*, 39 M.J. 448, 449 (C.M.A. 1994), *overruled on other grounds by United States v. Fosler*, 70 M.J. 225 (C.A.A.F. 2011) (concluding that a finding of guilty, as excepted, did not state an offense). "A finding of guilty to the overall charge, but not guilty to one of the elements of the charge through exceptions and substitutions, amounts to a finding of not guilty." *Ayalacruz*, 79 M.J. at 753 (cleaned up). If a finder of fact excepts an essential element of a charged offense, we are not at liberty to fill it back in, even if we believe that the evidence presented at trial supports proof of that element. *Id*. (citing *Smith*, 39 M.J. at 451-453).

At issue in this case is whether creating an offensive working environment was an essential element of the charged offense. We conclude it was. Appellant was charged with violating ALCOAST Commandant Notice (ACN) 085/18, which, in relevant part, provides:

> Definition: Sexual Harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

a.  Submission to such conduct is made either implicitly or explicitly a term or condition of employment;

b.  Submission to or rejection of such conduct is used as a basis for employment decisions; or

c.  Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

d.  This definition also encompasses unwelcome display or communication of sexually offensive materials.

ACN 085/18, para. 2 (26 Aug 19).

Prior to trial, Appellant challenged the sufficiency of the specification on the basis that it was impossible that Appellant created a hostile work environment at PO3 C.L.'s "A" school because he had no connection to it. During argument on the motion to dismiss the specification, the military judge asked trial defense counsel whether there would be any issue if he simply struck that language. Trial defense counsel responded that would leave an insufficient specification because the language is necessary to allege a violation of the sexual harassment order. The Government did not dispute that an effect on the working environment needed to be alleged and proved. Rather, it argued that the entire Coast Guard was the working environment and that it was therefore possible for Appellant to affect it.

The military judge denied the motion to dismiss. In his findings of fact, he noted:

ACN 085/18 defines sexual harassment as unwelcome sexual advances, request[s] for sexual favors, and other verbal or physical conduct of a sexual nature when:

a. Submission to such conduct is made either implicitly or explicitly a term or condition of employment;

b. Submission to or rejection of such conduct is used as a basis for employment decisions, or

c. Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

App. Ex. IX at 2.

The military judge concluded that the specification alleged all necessary elements, including that Appellant's actions created an offensive working environment. He put the parties on notice that beyond proving the actus reus of sending a digital image of male genitalia, the Government "must also prove the conduct created an offensive working environment. While not defined in ACN 085/18, the specification provided the working environment in question—'A' school." App. Ex. IX at 4. The military judge noted that the order places no limitation on where the sexual harassment must occur, whether on-duty or off-duty, as long as it impacts the victim's working environment.

Following the close of evidence, the military judge reversed course. He found Appellant guilty of the specification except the words, "while she was attending 'A' school which created an offensive work environment." He issued special findings where he now stated that "ACN 085/18 defines sexual harassment as 'other verbal or physical conduct of a sexual nature . . .' and 'encompasses unwelcome display or communication of sexually offensive materials.'" App. Ex. XXVIII at 9 (ellipsis in original). He found that Appellant "was on notice that, as part of the specification, he had sexually harassed the named victim by communicating sexually offensive materials" and that while the Government had proved beyond a reasonable doubt that Appellant sent an unwelcome video, it had not proven that it created an offensive working environment. *Id*. In short, upon reconsideration, the military judge interpreted ACN 085/18 as not requiring the Government to prove that Appellant's conduct created an offensive working environment.

Reviewing the military judge's interpretation of the order de novo, *United States v. Gifford*, 75 M.J. 140, 142 (C.A.A.F. 2016), we disagree. Although the military judge ends this sentence with an ellipsis—"ACN 085/18 defines sexual harassment as 'other verbal or physical conduct of a sexual nature . . .' "—the next word in the order is "*when*." Plainly, this means that some other condition must be met. As mentioned earlier, what follows is this:

    a.  Submission to such conduct is made either implicitly or explicitly a term or condition of employment;

    b.  Submission to or rejection of such conduct is used as a basis for employment decisions; or

    c.  Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

    d.  This definition also encompasses unwelcome display or communication of sexually offensive materials.

In effect, the military judge, joined now by the Government on appeal, reads subparagraph d as a standalone prohibition of an unwelcome display or communication of sexually offensive materials—with or without a connection to the workplace. We, however, believe the military judge was correct in his initial ruling that, read as a whole, the order requires not just an actus reus, but an effect: one of the three workplace connections listed in subparagraphs a through c. Notably, a through c are separated by semicolons and the disjunctive "or," supporting that one of those impacts must be proven. Beyond these clues, it would be nonsensical to read subparagraph d as belonging to the list, as it would then read "when . . . [t]his definition also encompasses unwelcome display or communication of sexually offensive materials." We conclude, instead, that subparagraph d merely adds to the definition of what may suffice as an actus reus without negating that it must result in one of the three listed effects.

This is supported by the context of the order, which states as its policy, "All Coast Guard personnel, military and civilian, will be provided a *work environment free from Sexual Harassment*. Off-duty or non-duty behaviors *that affect the military workplace* may also be considered to be Sexual Harassment." ACN 085/18, para. 3 (26 Aug 19) (emphasis added). It is also supported by a subsequent revision clarifying that an unwelcome display or communication of sexually offensive materials still requires an impact on the workplace:

Definition: sexual harassment is unwelcome sexual advances, requests for sexual favors, and other conduct of a sexual nature, when:

    a.  Submission to such conduct is made either implicitly or explicitly a term or condition of employment;

    b.  Submission to or rejection of such conduct is used as a basis for employment decisions; or

> c. Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. This definition also includes unwelcome display or communication of sexually offensive materials. Physical proximity is not required. Conduct may occur telephonically, virtually, or by way of other electronic means.

ACN 003/20, para. 3 (7 Jan 20).

We conclude that an impact on the workplace, as alleged in the specification, was required to prove a violation of ACN 085/18. By finding Appellant not guilty of that portion of the specification alleging the required workplace impact, the military judge effectively acquitted Appellant of the specification.

## Sentence Reassessment

Based on our action on the findings, we must determine whether we can reassess the sentence or whether a rehearing is necessary. We enjoy broad discretion in reassessing sentences. *United States v. Winckelmann,* 73 M.J. 11, 15 (C.A.A.F. 2013); *United States v. Hernandez,* 78 M.J. 643, 647 (C.G. Ct. Crim. App. 2018). But before we can reassess a sentence, we must be able to "reliably and confidently determine that, absent the error, the sentence would have been at least of a certain magnitude." *Hernandez,* 78 M.J. at 647 (citing *United States v. Buber,* 62 M.J. 476, 479 (C.A.A.F. 2006); *United States v. Harris,* 53 M.J. 86, 88 (C.A.A.F. 2000)). If we cannot do this, we must order a rehearing. *Harris,* 53 M.J. at 88. A reassessed sentence must not only "be purged of prejudicial error[,]" but "also must be 'appropriate' for the offense involved." *United States v. Sales,* 22 M.J. 305, 308 (C.M.A. 1986).

We apply the totality of the circumstances of each case to make sentence reassessment determinations, guided by the following "illustrative, but not dispositive, points of analysis":

(1) Whether there has been a dramatic change in the penalty landscape or exposure.

(2) Whether sentencing was by members or a military judge alone. We are more likely to be certain of what sentence a military judge would have imposed as opposed to members.

(3) Whether the remaining offenses capture the gravamen of criminal conduct included within the original offenses and, similarly, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses.

(4) Whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial.

*Winckelmann,* 73 M.J. at 15–16.

Although setting aside the sexual harassment conviction represents a significant change to the penalty landscape, we conclude, on the whole, that we are able to reassess the sentence. We determine that, absent the sexual harassment conviction, the sentence would have been at least reduction to E-6, a reprimand, and restriction for thirty days. This sentence not only purges the erroneous conviction, but is appropriate. We recognize that this is a significant punishment for disrespect, but Appellant's immature, unprofessional, and divisive behavior while a member of the Chief's Mess merits his removal from it.

## Decision

The findings of guilty to Specification 2 of Charge II and to Charge II are set aside. Specification 2 of Charge II and Charge II are dismissed with prejudice. Only so much of the sentence as provides for reduction to E-6, a reprimand, and restriction for thirty days is approved. The current reprimand, which references the sexual harassment conviction, is set aside. A revised reprimand shall be substituted. We determine that the remaining findings and the reassessed sentence are correct in law and, on the basis of the entire record, should be approved. Accordingly, the remaining findings of guilty and the sentence, as reassessed, are affirmed.

Chief Judge McCLELLAND and Judge MANNION concur.



For the Court,

Sarah P. Valdes
Clerk of the Court