UNITED STATES, Appellee,

v.

Ronald L. DIGGS, Staff Sergeant,
U.S. Army, Appellant.

No. 99–0040.
Crim.App. No. 9700186.

U.S. Court of Appeals for
the Armed Forces.

Argued Nov. 8, 1999.

Decided Feb. 23, 2000.

SULLIVAN, J., delivered the opinion of the Court, in which CRAWFORD, C.J., and COX, S.J., joined. GIERKE, J., filed an opinion concurring in part and dissenting in part, in which EFFRON, J., joined.

For Appellant: *Major Jonathan F. Potter* (argued); *Lieutenant Colonel Adele H. Odegard* and *Major Leslie A. Nepper* (on brief); *Colonel John T. Phelps, II,* and *Major Scott R. Morris.*

For Appellee: *Captain Joseph A. Pixley* (argued); *Lieutenant Colonel Eugene R. Milhizer* and *Captain Mary E. Braisted* (on brief); *Colonel Russell S. Estey.*

Judge SULLIVAN delivered the opinion of the Court.

Appellant, a staff sergeant (E–6), was tried by a special court-martial composed of officer and enlisted members at Rose Barracks, Vilseck, Germany. Contrary to his pleas, he was found guilty of assault on a fellow non-commissioned officer (an E–5), resisting apprehension by that soldier, and a service disorder by being naked in that same soldier's bedroom with that soldier's wife. Arts. 91, 95, and 134, Uniform Code of Military Justice, 10 USC §§ 891, 895, and 934, respectively. On January 24, 1997, he was sentenced to a bad-conduct discharge, confinement for 3 months, forfeiture of $600 pay per month for 3 months, and reduction to E–1. On April 13, 1997, the convening authority approved this sentence, and the Court of Criminal Appeals affirmed without opinion on July 14, 1998.

On March 1, 1999, this Court granted review on the following two issues of law:

I. WHETHER THE EVIDENCE WAS LEGALLY SUFFICIENT TO CONVICT APPELLANT OF RESISTING APPREHENSION WHERE THE EVIDENCE SHOWS THAT SERGEANT VADEN INDICATED THAT HE AND APPELLANT WERE GOING TO GO TO THE MP STATION TOGETHER, ALTHOUGH SERGEANT VADEN FAILED TO ADVISE APPELLANT IN ANY WAY THAT HE WAS UNDER APPREHENSION.

II. WHETHER THE EVIDENCE WAS LEGALLY SUFFICIENT TO CONVICT APPELLANT OF ASSAULTING A NONCOMMISSIONED OFFICER WHILE THAT NONCOMMISSIONED OFFICER WAS IN THE EXECUTION OF HIS OFFICE.

We hold that the evidence of record is legally sufficient to support findings of guilty to the above offenses. *See generally Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Sergeant Patrick Vaden testified that he deployed to Bosnia sometime in 1995 with Bravo Company, 2d Battalion, 2d Infantry Regiment. He had been in the Army 8 years and married to Chung Sun Vaden for 6 years. His company returned unexpectedly to his unit stationed at Rose Barracks, Vilseck, Germany, on September 16, 1996, and he asked his executive officer, Lieutenant Able, to give him a ride to his home in the housing area.

Sergeant Vaden then gave the only testimony on the charged offenses as follows:

Q. Okay. What did you do after Lieutenant Able dropped you off at your home?

A. I went into my home, sir.

Q. Did you ring the doorbell?

A. No, sir, I had a key.

Q. What happened next?

A. I went inside my home. I went upstairs. My spouse had come to the top of the stairs out of the bedroom. I went into the bedroom, turned the lights on, sir, and I looked around. I opened the closet door and that's when I saw Staff Sergeant Diggs in my closet, naked.

Q. Backing up a bit, when you were on the stairs, what was your wife wearing when she was at the top of the stairs?

A. She was wearing a t-shirt or a teddy, she had a blanket around her, sir, some type of sleeping gear.

Q. How do you describe her demeanor?

A. She was pretty surprised I was home, sir.

Q. Were you surprised at the way she was acting?

A. Somewhat, sir.

Q. And why is that?

A. Well, because, you know, I had come home from Bosnia and her only question was, "What was I doing home?"

Q. What were you wearing at this time?

A. I was wearing BDUs, sir.

Q. All right. Returning to the bedroom, and you testified that you opened the closet door, you said Sergeant Vaden, could you please exactly—can you please describe exactly what you saw when you opened the closet door?

A. At first—when I first opened the closet, the door, the light was on. It was dark

inside the closet. But, like a—just like a little ray of light came into the closet when I first opened it. And that's when I saw Staff Sergeant Diggs' face. He was naked, he was crouched down on the floor of my closet. He said, "Oh, my God," or "Oh, God," something to that effect. Okay. And then I went ahead and opened the rest of the closet door, sir.

Q. Let's make it perfectly clear, is the man that you saw naked in your closet that night here in this courtroom today?

A. Yes, sir, beyond the shadow of a doubt, sir.

Q. Could you indicate him?

A. That's Staff Sergeant Diggs [points at accused]. He's sitting right there, sir.

TC: May the record reflect that the witness has indicated the accused.

Q. What did Sergeant Diggs say, if anything, when you opened the door?

A. Like I stated, sir, he said, "Oh, my God," or "Oh, God."

Q. *And what did you do next when you saw him?*

A. *It was just like a reaction, I just—I went down on him and hit him a couple of times, sir.*

Q. What position was he in?

A. Initially he was just squatting down in the floor of my closet. When I went ahead and opened the closet door, and went to hit him, he went ahead and rolled onto his side, sir.

Q. *How many times did you hit him?*

A. *Three or four times, sir.*

Q. *And where did you hit him?*

A. *In the side and in the arm, sir.*

Q. Did you have anything in your hands as you hit him?

A. When I came into the house, I had my keys in my hands, sir, and I had those the whole way up there. So I had my keys in my hand.

Q. Did you use your keys as a weapon in any way?

A. No, sir, absolutely not.

Q. Why did you hit him?

A. I can't explain why I hit him, sir, it was just a natural reaction. I mean, it wasn't anger or, you know, revenge or anything, I just did it. I don't know why I did it. I just did it, sir. It was like a reflex, you know.

Q. *What happened next?*

A. *Like I stated, I hit him about three times, sir, and then my spouse got into— between us. And at that time I backed up off from him, sir.*

Q. After you backed up off from him, what did he do?

A. He came up out of the closet—we kind of circled around and he came up out of the closet and my spouse was standing a little off to my left. *He was standing on the other side of the bed from me. You know, he told me to "calm down," that he'd been caught. He was going to turn himself in.*

Q. Did you respond to his statement?

A. *Yes, sir. I said, "Yes, he was caught and, yes, he was going to turn himself in. And he was going to come with me and we both were going to go to the MP station together," sir.*

Q. So you're convinced that he understood you were going to take him into the MP station?

A. He definitely understood, sir.

Q. And you were wearing your BDUs at this time still. Is that correct?

A. Yes, sir.

Q. I assume your BDUs have all the proper insignia on them?

A. That's correct, sir.

Q. What happened after this conversation? What happened next?

A. After this conversation, he—a couple of things were happening all at the same time, you know, while we were talking, he was putting his pants on and stuff, sir, and getting dressed. He was putting on BDUs as well. While all this was going on, we were also moving downstairs, sir. Eventually we got down to the bottom of the stairs. At some point, my spouse left and went outside and got in the car and drove off, and Staff Sergeant Diggs and myself were at the entranceway of my home and he was putting his boots on, sir. He'd already got his top on—he grabbed a PT

top off the balcony on the way down, sir. So he was—in state, he was getting dressed downstairs in the doorway with me, and my spouse had already left at this time, sir.

Q. Did you tell him anything? Did you say anything to him as he was putting on his boots?

A. I was hurrying him up, 'cause it was like he was stalling for time, you know.

Q. What happened after you hurried him up?

A. Well, eventually, he got his boots on and came out the doorway, you know. *I had to turn my back on him to come out the doorway and right when I got outside, he pushed me off to the left.*

Q. *Did you go out the doorway first?*

A. *Yes, sir.*

Q. *And he was behind you. Correct?*

A. *Yes, sir.*

Q. *How hard did he push you?*

A. *Pretty hard, sir.*

Q. *Did he push you over?*

A. *He pushed me onto the ground, sir.*

Q. What happens after he—what happened after he pushed you down on the ground?

A. When I got up and I turned around, he was already running up through the housing area, sir, you know. I gave chase for a little bit, but I couldn't catch him, sir.

Q. Can you estimate how far you chased him?

A. I chased him for maybe 20 or 30 meters, sir.

Q. And why do you stop chasing him?

A. He was just too fast for me, sir. He had a head start on me and he was moving out.

Q. Now from the time you got home to the time that you broke off the chase, how much time had passed?

A. Less than 10 minutes, sir.

Q. What did you do after you broke off the chase?

A. I kind of stood there for a few minutes, sir. I didn't really know what to do, you know. My wife had taken off with the car, this guy had run off through the housing area, you know. I'm standing there with the door of my house open. I had just gotten home from Bosnia. I was kind of bewildered and confused. I didn't exactly know what to do next—step—point, sir.

Q. Where did you go after that?

A. I went to the MP station, sir.

Q. How long did it take you to get there?

A. Less than—about 10 minutes, sir.

Q. Did you walk or did you drive?

A. I walked, sir.

Q. So approximately what time did you arrive at the MP station?

A. Midnight, maybe a little before midnight, sir.

Q. Who did you talk to at the MP station?

A. I talked to several people. I talked to a couple desk sergeants. They were reservists and they didn't know what to do, so they had to get on the telephone and call some other people. Eventually, Investigator Carson arrived at the MP station and he's the one I talked to, sir.

Q. And how much time passed between your arrival at the MP station and your talking to Investigator Carson?

A. Maybe 10 minutes, sir.

Q. What did you tell Investigator Carson, if anything?

A. Well basically I told him the story I just told you, sir.

(Emphasis added.)

I

The first granted issue challenges the sufficiency of the evidence in this case to support appellant's conviction for resisting apprehension in violation of Article 95. He contends, as he did at trial,[1] that the prosecution did not introduce sufficient evidence to

---

1. *See United States v. Sherod,* 960 F.2d 1075, 1077 (D.C.Cir.1992); *see generally* 2 Wright, *Federal Practice and Procedure* § 469 at 670–75 (2nd ed.1982) (discussing federal rule that sufficiency of evidence will not be reviewed by appellate courts absent objection at trial unless plain error).

prove all the elements of this offense. *See generally* para. 19b, Part IV, Manual for Courts–Martial, United States (1995 ed.). In particular, he asserts that there was no evidence presented that he was "clearly notified that he [was] in custody" before he allegedly pushed Sergeant Vaden and ran away. Final Brief at 12. We disagree.

There is no dispute that the prosecution was required to prove that appellant had clear notice of the apprehension which he was charged with resisting. *See* para. 19c(1)(a), Part IV, Manual, *supra; United States v. Garcia–Lopez*, 16 MJ 229, 231 (CMA 1983) (holding that an apprehension is "effected by clearly notifying the person to be apprehended that he is thereby taken into custody."). Moreover, there is no real dispute that such notification need not be oral or written but "may be implied by the circumstances" in a particular case. *See* RCM 302(d)(1), Manual, *supra; see also United States v. Kinane*, 1 MJ 309, 313–14 (CMA 1976). The critical question before us is whether the evidenced circumstances of this case were such that a rational person could find beyond a reasonable doubt that appellant knew he was being apprehended. *See generally Jackson*, 443 U.S. at 319, 99 S.Ct. 2781.

The circumstances that constitute clear notice of apprehension have been determined on a case by case basis. In *United States v. Garcia–Lopez, supra*, this Court held that the entrance of military authorities into a servicemember's barracks room announcing their intention to search his room and directing him to stay in that room was not clear notice of an apprehension. In *United States v. Sanford*, 12 MJ 170, 173–74 (CMA 1981), this Court held that words from a sergeant to another enlisted man that "Lieutenant Young wants to see you," and following that servicemember to the battery commander's office did not constitute clear notice of apprehension. Finally, in *Kinane, supra* at 311, 313–14, this Court deferred to a lower court's finding that bringing a servicemember to the site of an alleged crime, reading him his rights, and subsequently questioning him did not constitute a custodial arrest.

The circumstances of appellant's case are quite different from those noted in the above cases. Here, there was evidence that he was discovered naked in a fellow sergeant's room closet, late at night, just after that servicemember's wife emerged partially clad from that room. This evidence suggested that appellant, at the very least, was engaging in an ongoing service disorder or discredit in violation of Article 134. *See United States v. Frazier*, 34 MJ 194 (CMA 1992) (holding that romantic behavior not amounting to sexual intercourse between officer and enlisted man's wife was conduct unbecoming an officer). Moreover, evidence was introduced that appellant admitted his wrongdoing and that he should be placed in the custody of military police. This was not a situation where a servicemember was simply being questioned or investigated for a prior offense. *Cf. U.S. v. Kinane* and *U.S. v. Garcia–Lopez*, both *supra*. Finally, there was evidence that Sergeant Vaden rejected appellant's offer to turn himself in and insisted that this senior noncommissioned officer subject himself to a junior noncommissioned officer's control. This was not a routine military practice or operation in any way. *Cf. United States v. Sanford, supra*.

In our view, these circumstances could lead a rational factfinder to find beyond a reasonable doubt that appellant had clear notice of his apprehension by Sergeant Vaden. An extraordinary situation was evidenced, in which criminal liability was expressly admitted by a senior noncommissioned officer and personal control or custody exercised by a subordinate noncommissioned officer. Of course, the factfinders were free to decide that notice of apprehension was not clear, but such a possibility did not undermine the legal sufficiency of the evidence in this case. *See United States v. Harper*, 22 MJ 157, 163 (CMA 1986); *United States v. Ford*, 23 MJ 331, 337 (CMA 1987). The members in this case, under proper instruc-

tions, decided otherwise, and we perceive no legal basis to overturn their decision. *See Jackson v. Virginia, supra.*[2]

## II

█ The second granted issue is again phrased in terms of legal sufficiency, but it concerns appellant's conviction for assault on a noncommissioned officer in the execution of his duties, in violation of Article 91. That codal provision provides special protection to a noncommissioned officer from assaults while "that officer is in the execution of his office." Appellant argues that, based on the evidence in this case, no reasonable person could find that Sergeant Vaden was acting consistent with his status and office as a noncommissioned officer when he was pushed by appellant. *See generally United States v. Lewis,* 7 MJ 348, 350 (CMA 1979).

Appellant initially argues that the evidence shows Sergeant Vaden was on a personal "frolic" of revenge when he attempted to apprehend appellant. *See id.* at 351–52; para. 14c(1)(b), Part IV, Manual, *supra.* This was a question of fact for the members. *See also United States v. Hoffer,* 869 F.2d 123, 125 (2d Cir.1989) (holding no bright-line test in determining whether federal officer acting in execution of office or on personal frolic). There was evidence here of a soldier caught in the act of committing a crime (a service discredit or disorder) in military housing and his restraint by a noncommissioned officer. *See* Art. 7(b), UCMJ, 10 USC

§ 807(b); *see also United States v. Hoy,* 137 F.3d 726 (2d 1998); *United States v. Reid,* 517 F.2d 953, 964 (2d Cir.1975) (arrest made by officer although not specifically mandated by Congress). Moreover, there was evidence that the arresting officer employed normal apprehension procedures to terminate this potentially explosive situation. *See Lewis, supra* at 352 (manner of arrest may give rise to departure-from-office claim). Accordingly, the members had an evidentiary basis to decide that Sergeant Vaden was acting as a noncommissioned officer, not an avenging cuckold, when he attempted to escort appellant to the military police station. *See United States v. Clemons,* 32 F.3d 1504, 1507 (11th Cir.1994) (recognizing "purely personal frolic" standard).

Appellant also argues that Sergeant Vaden divested himself of the protections of his office by his earlier conduct in repeatedly striking appellant while he cowered naked in Sergeant Vaden's closet. *See* para. 14c(1)(d), Part IV, Manual, *supra.* He cites numerous cases from our Court for the proposition that the defense of divestiture exists when an officer engages in misconduct antithetical to his status as an officer. *See United States v. Richardson,* 7 MJ 320 (CMA 1979); *United States v. Hendrix,* 21 USCMA 412, 45 CMR 186 (1972); *United States v. Struckman,* 20 USCMA 493, 43 CMR 333, (1971); *United*

---

**2.** On a personal note, I find facially appealing merit in the factual-based arguments of my esteemed brother in dissent. I would listen more attentively to him if he and I were sitting side-by-side in a jury box, rather than on an appellate bench. However, the binding precedent and operating limitations of *Jackson v. Virginia, supra,* leave me little choice in affirming the convictions of appellant which were properly determined by the jury in this case.

The jury in the United States military justice system is one of the best in the world. Almost all officer members have at least one university degree, and most enlisted personnel have some university education. More importantly, the jury in the military is expert at sorting out military issues such as the functioning between the rank structure (sergeant E–5 and staff sergeant E–6) and the responsibilities of noncommissioned officers, even in the extraordinary circumstances of the present case—a soldier unexpectedly returns home from a deployment to Bosnia and finds his wife with a naked man in his own bedroom. I

trust the jury's verdict here. The jury is an amazing institution.

Almost 80 years ago, G.K. Chesterton, the English essayist, observed the following about a jury:

Our civilization has decided, and very justly decided, that determining the guilt or innocence of men is a thing too important to be trusted to trained men. It wishes for light on that awful matter, it asks men who know no more law than I know, but who can feel the things I felt in the jury box. When it wants a library catalogued, or the solar system discovered, or any trifle of that kind, it uses up its specialists. But when it wishes anything done which is really serious, it collects twelve of the ordinary men standing round. The same thing was done, if I remember right, by the Founder of Christianity.

Gilbert K. Chesterton, *Tremendous Trifles: The Twelve Men* (New York, Dodd Mead and Company, 1922) at p. 86–87.

*States v. Noriega*, 7 USCMA 196, 21 CMR 322 (1956); *cf. Lewis, supra* at 350. We disagree with his argument in this case.

We initially note that Sergeant Vaden's conduct in physically striking appellant while naked in Sergeant Vaden's closet was a criminal assault for which he could have been prosecuted under Article 128, UCMJ, 10 USC § 928. *Cf.* 2 W. LaFave & A. Scott, *Substantive Criminal Law* § 7.10 at 259 (1986) (noting unanimity of modern authorities rejecting unwritten law that no crime at all for enraged husband to kill wife's paramour). Moreover, such misconduct on his part divested him of his authority as a non-commissioned officer for purposes of immediate physical responses by appellant. *See* para. 14c(1)(d), *supra; United States v. Struckman* and *United States v. Lewis,* both *supra.* Nonetheless, other evidence was admitted in this case that Sergeant Vaden desisted in his illegal conduct and, thereafter, attempted to resolve this matter within appropriate military channels.

We do not view our divestiture case law as establishing a *per se* rule that once an officer engages in misconduct, he can never assert or regain his status or office. *See United States v. Lewis, supra* (rejecting *per se* rule that propriety of conduct is totally dependent on finding of probable cause). Such a rule would implicitly discourage officers from stopping their misconduct and impermissibly narrow the broad protection afforded public officers in the performance of their legitimate duties. *See generally United States v. Hoy, supra.* Instead, whether Sergeant Vaden was divested of his office as a noncom-

missioned officer making an apprehension was a question for the members to decide on the basis of all the circumstances of this case under appropriate instructions provided by the military judge.[3] Accordingly, we find no legal insufficiency on this basis. *See also United States v. Frizzi*, 491 F.2d 1231, 1232 (1st Cir.1974) (conviction for assaulting federal officer approved where postal worker left his car and sought apology from traffic-enraged citizen who later spit on him).

The decision of the United States Army Court of Criminal Appeals is affirmed.

GIERKE, Judge, with whom EFFRON, Judge, joins (concurring in part and dissenting in part):

I agree with only so much of the majority opinion as affirms appellant's conviction of conduct prejudicial to good order and discipline, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. I disagree with the majority's conclusion that the evidence is legally sufficient to support appellant's conviction of resisting apprehension and assaulting a noncommissioned officer (NCO) in the execution of his office, in violation of Articles 95 and 91, UCMJ, 10 USC §§ 895 and 891, respectively.

In my view, the evidence of resisting apprehension is legally insufficient on two grounds. First, no rational person could conclude beyond a reasonable doubt that appellant knew that Sergeant (SGT) Vaden was attempting to exercise his authority as an NCO to apprehend him. What appellant saw was an enraged husband who had just attacked him. SGT Vaden's attack on appel-

---

**3.** The question of divestiture was presented by the military judge to the members by means of instructions unobjected to by the defense. He said:

Now the evidence has raised an issue as to whether Sergeant Vaden conducted himself—or himself prior to the alleged offense in a manner which took away his status as a noncommissioned officer acting in the execution of his office. *A noncommissioned officer whose own language and/or conduct under all the circumstances departs substantially from the required standards appropriate for that individual's rank and position under similar circumstances is considered to have abandoned*

*that rank and position.* In determining this issue, you must consider all the relevant facts and circumstances, including Sergeant Vaden's conduct between the time he—or at the time he found someone in his bedroom closet and up until the time that that someone ran away from him.

You may find the accused guilty of the offense of assault on a noncommissioned officer, in violation of Article 91 of the Uniform Code of Military Justice, only if you are satisfied beyond a reasonable doubt that Sergeant Vaden did not, by his conduct and/or language, abandon his status as a noncommissioned officer acting in the execution of his office.
(Emphasis added.)

lant stopped only because Mrs. Vaden intervened. SGT Vaden was junior to appellant and not engaged in law enforcement duties. At no time did he say or do anything indicating that he was invoking his status as an NCO.

Appellant's response to SGT Vaden's attack was to assure SGT Vaden that he would turn himself in. SGT Vaden agreed with appellant's offer to turn himself in, and he told appellant that he would go with him to the military police station, obviously to ensure that appellant did in fact turn himself in. Appellant's offer to turn himself in, and SGT Vaden's agreement with that offer, are inconsistent with any notion that SGT Vaden was trying to apprehend him.

Second, even if a rational factfinder could conclude beyond a reasonable doubt that appellant knew SGT Vaden was attempting to apprehend him, the evidence does not support a charge of resisting apprehension. Apprehension is complete when the person being apprehended submits to authority or is physically subdued. *See* para. 19c(3)(a), Part IV, Manual for Courts–Martial, United States (1995 ed.).[1] Assuming *arguendo* that there was an apprehension, it occurred when appellant allegedly submitted to SGT Vaden's control in the bedroom. From that point on, appellant was in custody. Paragraph 19c(1)(c), *supra*, provides that "attempts to escape from custody after the apprehension is complete do not constitute the offense of resisting apprehension." *See also*

*United States v. Glaze*, 11 MJ 176, 177 n. 1 (CMA 1981); *United States v. Ridgeway*, 13 MJ 742, 748 (ACMR 1982).

I also disagree with the majority's conclusion that the evidence is legally sufficient to support appellant's conviction of assaulting a noncommissioned officer "in the execution of his office." SGT Vaden's actions throughout the altercation were personal, not official. SGT Vaden's actions were those of an avenging victim, not a sergeant in the execution of his office. His first action, physically attacking appellant, was clearly personal and inconsistent with any officiality. SGT Vaden did nothing after that attack to invoke his status as a noncommissioned officer.

Finally, in my view, there is no issue of divestiture. Divestiture occurs only when the actor holds authority by virtue of rank or position and divests himself or herself of that authority by improper conduct. *See* paras. 14c(1)(b) and 15c(3), Part IV, Manual, *supra*;[2] *United States v. Lewis*, 7 MJ 348, 352 (CMA 1979). SGT Vaden neither held nor invoked any authority. He was junior to appellant, not engaged in law enforcement or occupying any position of authority over appellant, and never invoked or relied on his status as an NCO to apprehend or detain appellant, or to hold him in custody.

In my view, the majority's decision is contrary to the law and the facts. Accordingly, I dissent.

---

1. Although paragraph 19 was substantially revised in the 1998 Manual, this provision was unchanged except for being renumbered as paragraph 19c(4)(a).

2. These paragraphs are unchanged in the 1998 edition.