# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

## No. ACM 40111

————————————

## UNITED STATES
*Appellee*

v.

## Erland E. INJERD
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 20 December 2022

————————————

*Military Judge:* Christopher James.

*Sentence:* Sentence adjudged on 6 March 2021 by GCM convened at Dyess Air Force Base, Texas. Sentence entered by military judge on 26 March 2021: Dishonorable discharge, confinement for 30 months, and reduction to E-1.

*For Appellant:* Major Alexandra K. Fleszar, USAF; Mark C. Bruegger, Esquire.

*For Appellee:* Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major Morgan R. Christie, USAF; Major John P. Patera, USAF; Captain Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and CADOTTE, *Appellate Military Judges*.

Senior Judge POSCH delivered the opinion of the court, in which Judge RICHARDSON and Judge CADOTTE joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

POSCH, Senior Judge:

A general court-martial composed of a military judge convicted Appellant, contrary to his pleas, of attempting to escape custody, desertion, resisting apprehension, striking a superior noncommissioned officer, failure to obey a lawful order, unlawfully carrying a concealed handgun, assault upon a person in the execution of military law enforcement duties, fleeing apprehension, and resisting apprehension, in violation of Articles, 80, 85, 87a, 91, 92, 114, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 885, 887a, 891, 892, 914, 928, 934, respectively.[1,2] Appellant was sentenced to a dishonorable discharge, confinement for 30 months, and reduction to the grade of E-1.[3]

On 26 March 2021, the convening authority signed a Decision on Action memorandum that deferred the reduction in grade until entry of judgment. At the same time, the convening authority waived automatic forfeitures for the benefit of Appellant's spouse and two dependent children for a period of six months, or upon release from confinement or expiration of term of service, whichever was sooner, with the waiver commencing on the date of the decision on action.[4] The convening authority took no action on the sentence.

On appeal, Appellant raises 15 issues, two of which are assignments of error raised through appellate counsel. Appellant asks whether: (1) his conviction for resisting apprehension by Officer JB, a Department of the Air Force police officer, as alleged in Specification 1 of Charge I, is legally and factually insufficient; and (2) his sentence of 30 months confinement, as reflected in the entry of judgment, exceeds the adjudged sentence. In addition to these issues, Appellant personally raises 13 issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). In that regard, Appellant contends that (3) his squadron commander lacked authority to strip him of his Second Amendment[5]

---

[1] References to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Consistent with Appellant's pleas, he was acquitted of one specification each of fleeing apprehension and assaulting a superior noncommissioned officer, in violation of Articles 87a and 91, UCMJ, 10 U.S.C. §§ 887a, 891.

[3] The military judge ordered that Appellant receive 304 days' credit plus an additional 5 days of judicially ordered credit for illegal pretrial punishment under Article 13, UCMJ, 10 U.S.C. § 813—for a total of 309 days of confinement credit.

[4] The entry of judgment states that the convening authority directed the waiver to begin "on the date of this judgment [26 March 2021]," which is incorrect, but of no consequence because the military judge entered judgment the same day as the convening authority's decision on action.

[5] U.S. CONST. amend. II.

right to possess a firearm in his home, and accordingly, the attempted seizure of his personally owned firearms was unlawful, rendering his conviction for resisting apprehension legally and factually insufficient; (4) his conviction for assaulting Officer JB is legally and factually insufficient; (5) his conviction for assaulting his supervisor, a noncommissioned officer (NCO), is legally and factually insufficient; (6) his sentence to 14 months' confinement for assaulting Officer JB (6 months) and his supervisor (8 months) is inappropriately severe; (7) his conviction for carrying a concealed weapon is factually and legally insufficient; (8) the omission of Prosecution Exhibit 16 is a substantial omission that warrants setting aside his conviction for desertion;[6] (9) the preemption doctrine prohibited the Government from charging him with fleeing and resisting apprehension by federal civilian authorities in Specifications 1 and 2, respectively, of Charge VI as violations of Article 134, UCMJ, because Congress enumerated the underlying offenses in Article 87a, UCMJ; (10) the preemption doctrine prohibited the Government from charging him with attempt to escape from the custody of state civilian authorities in Specifications 1 and 2 of Charge VIII as attempted violations of Article 134, UCMJ, because Congress enumerated the underlying offenses in Article 87a, UCMJ; (11) the military judge erred by failing to merge for sentencing purposes the resisting apprehension and assault charges associated with Officer JB; (12) the military judge erred by failing to dismiss for findings, or merge for sentencing purposes, the specifications alleging he fled and resisted apprehension by federal civilian authorities; (13) assistant trial counsel committed prosecutorial misconduct by arguing that a dishonorable discharge was merely a service characterization rather than a punishment; (14) the military judge erred by not granting Appellant additional credit for the Government's violations of Article 13, UCMJ, 10 U.S.C. § 813; and (15) all of Appellant's convictions are legally and factually insufficient.

In this decision, we address Appellant's two assignments of error raised by counsel. With respect to the conviction for resisting apprehension by Officer JB in Specification 1 of Charge I, we conclude that the evidence is legally insufficient to affirm that conviction. Accordingly, we set aside the findings of guilty of Specification 1 of Charge I, and Charge I. Because that specification was the sole remaining specification under the charge, we dismiss with prejudice both Specification 1 of Charge I, and Charge I. As to the second assignment of error,

---

[6] Prosecution Exhibit 16 was described as a large container with compartments that held personal items that belonged to Appellant. Trial counsel described the items when she marked the exhibit, which was admitted without objection. Although the military judge permitted the Government to substitute photographs for the exhibit, the photograph is of the brown paper evidence bag that housed the container.

we find no merit to the contention that Appellant's sentence as reflected in the entry of judgment exceeds the adjudged sentence. As a result of our finding the conviction for Specification 1 of Charge I legally insufficient, we reassess the sentence to a dishonorable discharge, confinement for 27 months, and reduction to the grade of E-1.

With respect to the 13 issues personally raised by Appellant, issues (3) and (11) are mooted by our decision. With respect to the remaining issues, the court considered Appellant's arguments and finds none warrant discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Finding Appellant's remaining convictions legally and factually sufficient, and no other error materially prejudicial to a substantial right of Appellant occurred, we affirm the remaining findings and the sentence as reassessed.

# I. BACKGROUND

If there was one incident that set in motion a chain of events that would result in the convictions under review, it might be when Appellant learned that his squadron commander did not recommend his promotion to senior airman (E-4). On 10 April 2020, in a meeting with Appellant, the commander read aloud a written notification of that decision. He did so in the presence of Appellant's leadership team. He asked if Appellant had any questions. Appellant answered, "no," and was directed to sign an indorsement that stated he had been informed of the decision. After receiving a "direct order" from his commander to acknowledge "receipt and understanding," Appellant said he was not going to sign it. Appellant made this comment after discussing the matter privately with his first sergeant, a senior NCO in the grade of E-8.

For this incident, one week later Appellant's commander served him with a letter of reprimand for disobeying that direct order. As before, Appellant refused to acknowledge "receipt and understanding." He did, however, respond to the reprimand in an email on 22 April 2020. Appellant titled his email, "Faithless Power," and sent it to his group and squadron commanders and others in the unit. In a memorandum attached to that email, Appellant accused his commander of "blatantly lying," and challenged the commander's authority to issue orders. Alluding to ideals in the Preamble to the United States Constitution, Appellant disparaged his commander and leadership cadre, stating, among other things:

> I composed a few clever ideas then realized I would rather not throw my pearls before swine . . . .

> The fact is, there are boundaries on what [the squadron commander] -- or anyone else -- can order me to do, and endorsing any document does not fall in his purview. I have obeyed every

valid order I have been given -- including hints and even invalid orders on occasion, simply to engender peace and harmony -- but the question is, have those in leadership acquitted themselves well? Have they labored to form a more perfect union? Have they established justice? Have they worked to ensure domestic tranquility for those under them? Have they promoted the welfare of their [A]irmen? Whether my antagonists successfully fabricate sufficient calumnies to continue down their path, God only knows, but He also knows how much it may cost.

Appellant singled out his commander and others by name, stating: "[They] and their ilk have so much to lose." Appellant rhetorically asked, "[W]ho is to stop them" after they "dishonor someone" and "vilify" someone's "reputation."

As could be expected, Appellant's response captured the attention of superiors. Appellant's squadron commander testified he was disturbed by its "somewhat threatening tone." He described the response as "alarming" and unlike anything he had seen in his career. It caused him concern for his own safety and the safety of others. Appellant's supervisor, a senior NCO in the grade of E-7, testified that the response "was very different than anything [they] had received up to that point." Unlike past dealings where Appellant went into "very lengthy, very articulate, [and] very specific" detail "to explain his side of the story," this response suggested that "perhaps [Appellant] was done working within the systems that had already been laid out for him." The supervisor was especially bothered that Appellant had "list[ed] names of the individuals that perhaps could or would be judged," without stating "necessarily by whom."

Appellant's leadership cadre was aware that he kept three firearms in his residence on base. Appellant's supervisor testified "that before we were to enter into any subsequent rounds of administrative actions possibly involving the [s]quadron [c]ommander [and] . . . higher levels, that we would feel safer if we were able to have [Appellant] store his weapons at the base armory." The first sergeant sought guidance from the group commander and a chief master sergeant (E-9) who was the group superintendent. Acting on that guidance, the first sergeant recommended the commander "remove [Appellant's] weapons for a cool down period and get him over to mental health." In the first sergeant's telling, he made this recommendation because he "didn't feel comfortable with [his] commander's name being on an email that . . . [he] thought was directed as a threat to [his commander]."[7]

---

[7] The first sergeant believed it was standard practice in such a situation to temporarily remove weapons for a "cooling off" period. His belief was founded on almost 20 years

In response to the email and following the recommendation of the first sergeant, the commander directed the first sergeant "to temporarily remove [Appellant]'s firearms from his possession." Because Appellant lived on base, the commander asked the first sergeant to go to Appellant's home "to first ask him to voluntary relinquish his firearms . . . [a]nd if he didn't voluntarily relinquish control of his firearms to effect their relinquishment." The first sergeant did as instructed, first asking security forces for assistance because he was "not trained to remove weapons from homes." He testified that he believed "it's safer for law enforcement to remove those weapons."

What happened next led to three of Appellant's ten convictions, all of which he challenges on appeal. In the afternoon of 22 April 2020, Officer JB, a Department of the Air Force civilian police officer, was dispatched to Appellant's residence. In the presence of that officer, Appellant's first sergeant, and Appellant's supervisor, Appellant declined to voluntarily surrender his firearms. Appellant then refused to follow the officer's instructions to turn around and place his hands behind his back. As the officer approached, a melee ensued at the front door of the home. Evidence showed that Appellant assaulted the police officer by striking him in the face with a closed fist and inserting a finger into his eye. During the same incident, Appellant struck his supervisor in the face with a closed fist before Appellant retreated inside his home. For this conduct, Appellant was convicted of resisting apprehension by Officer JB, assault upon a person in the execution of military law enforcement duties, and striking a superior noncommissioned officer.

Almost immediately, additional security forces personnel were dispatched to the scene. In time, Appellant broke through a window in his home and ran to the perimeter of the base. He scaled a barbed wire fence and ran towards tree cover, where he eluded his pursuers.

Two weeks later, in Dallas, Texas, Appellant fled and resisted apprehension by officers of the Federal Bureau of Investigation. When Appellant was taken into custody, the officers discovered a concealed handgun Appellant carried inside the waistband of his shorts. Later that day, Appellant attempted to escape from the custody of officers of the Dallas Police Department and the Grand Prairie Detention Center. Appellant was convicted of desertion from his unit until apprehension by civilian authorities. In traveling to Dallas, Appellant violated an order that limited personnel to stay within a specified distance from Dyess Air Force Base unless on approved leave or other exception.

---

in the Air Force, including three tours as a first sergeant. The first sergeant testified that he took threats and suicidal ideation seriously because, prior to being a first sergeant, he had a commander who was killed in his office "by a member of [their] unit."

## II. DISCUSSION

We examine Appellant's claim that his conviction for resisting apprehension by Officer JB at the front door of his home is legally insufficient, and that his sentence of 30 months' confinement as reflected in the entry of judgment exceeds the adjudged sentence. We consider these allegations of error and begin with Appellant's contention that his conviction is legally insufficient.

### A. Legal Insufficiency

#### 1. Additional Background

Officer JB arrived at Appellant's home in a patrol car marked "Police." He wore a black uniform that displayed the Department of the Air Force Seal and "Police" on each shoulder. His uniform had a badge with his name over the right chest pocket and he wore a Department of the Air Force badge over the left chest pocket. On his duty belt he carried an M18 pistol, one extra magazine, an extendable baton, a taser with two cartridges, two sets of handcuffs, and a medical pouch.

When Officer JB arrived, Appellant's first sergeant and supervisor were already outside the home. They explained to the officer that they were there to remove Appellant's firearms and store them in the armory. Officer JB was informed that Appellant had sent a "manifesto" earlier that day with "threats" against various people. Officer JB understood that his "primary responsibility was the safety and security of those that were there." He testified that he informed the two NCOs that if Appellant refused to relinquish his firearms, he could detain Appellant.

Either Appellant's supervisor or first sergeant knocked on Appellant's door and Appellant answered. The first sergeant explained they were there out of concern due to Appellant's email in response to the letter of reprimand. The first sergeant told Appellant that he had an order from the commander to temporarily remove Appellant's firearms and put them in the base armory. Appellant asked if they had a warrant. The first sergeant responded that they did not need a warrant because they had an order from their commander. He explained that the removal was temporary, and the firearms would remain Appellant's personal property, but Appellant would not be permitted to keep them at his residence.

The first sergeant then asked Appellant if he would comply with the commander's order. Appellant stated that he "refused to do so," and was silent when he was again asked if he would comply. Appellant then asked, "What happens next?" The first sergeant testified he told Appellant that Officer JB would detain Appellant while Officer JB removed the firearms from the home:

> Q (Trial Counsel). How did you respond?

7

> A (First Sergeant). *I informed him that the officer would detain him and he would remove the weapons.*
>
> Q. So in this conversation with [Appellant] did you mention the Commander at all?
>
> A. No, ma'am. I don't believe so.
>
> Q. Did you mention if there was an order or not?
>
> A. I don't know if I did. I'm not sure.
>
> *Q. Why did you tell [Appellant] that then the officer was going to detain him?*
>
> *A. In order to remove the weapons.*

(Emphasis added).

Officer JB testified that while he and the two NCOs stood near Appellant on the front stoop, Appellant "began balling his fists [and] giving off [other] pre-assault indicators," namely a "clenched jaw" and "turning slightly red in the face." Officer JB also observed Appellant assume "a squared-off fighter's position with his hands by his side." Officer JB testified his focus was on "[t]he safety of everybody at the scene." He decided he "needed to gain control of the situation and deescalate" as much as possible. He told Appellant, "[W]e don't need to go down that road."

Officer JB ordered Appellant to turn around and place his hands behind his back. He testified that his purpose was so that he "could place [Appellant] in handcuffs for the time period so [they could] deescalate." He gave Appellant the order three times, and each time Appellant refused to comply. Officer JB testified that telling a suspect to "turn around" three times is considered "the final challenge position." It is the last step before an officer moves to place handcuffs on a person. Based on Appellant's three refusals, Officer JB began to approach Appellant to place handcuffs on his wrists.

On direct examination, Officer JB described what happened next:

> A [Officer JB]. As I approached after the third warning, [Appellant] swung at me at which point, I ducked and closed the distance.[8] *And that's where we began fighting.*
>
> Q [Trial Counsel]. How did he swing at you?

---

[8] In response to later questioning by the military judge, Officer JB explained he was about two feet away from Appellant when he extended his arm towards Appellant and "[t]hat's when [Appellant] swung at [him]."

A. I believe with his left hand.

Q. Was it a closed fist or an open hand?

A. A closed fist.

Q. Where was he aiming?

A. I believe my face.

(Emphasis added).

Officer JB described how, at that point, both NCOs "were attempting to assist [him] in placing [Appellant] in *custody*." (Emphasis added). In Officer JB's telling, "Unfortunately, whenever that happened, they pinned me up against [Appellant], so I was unable to move." Appellant used his left thumb and gouged Officer JB's right eye. In time, Officer JB broke free while the NCOs had Appellant "pinned up against the corner of the wall." Trial counsel asked Officer JB to describe what the NCOs were doing:

> Q [Trial Counsel]. When [Appellant's first sergeant and supervisor] had [Appellant] pinned up against the wall and you were backed with that reactionary gap that you had created, what were they doing on the wall?
>
> A [Officer JB]. I believe they were trying to gain control of [Appellant].
>
> Q. Was [Appellant] compliant or resistant?
>
> A. *Resistant.*
>
> Q. What do you mean by that?
>
> A. *He was not complying with any of our commands.*

(Emphasis added).

When he was free, Officer JB took steps in an attempt to subdue Appellant and place him in his custody. He removed his taser from its holster, and three times shouted to the NCOs to "[g]et off of him." Officer JB testified his purpose at that point was "so that [he] could reengage and place [Appellant] in *custody*." (Emphasis added). After Officer JB shouted "Taser, Taser, Taser" as a warning, the NCOs immediately let go of Appellant and backed up. However, before Officer JB could use the Taser, Appellant's wife intervened by opening the front door. As she stood in the doorway, she "grabbed [Appellant] by the arm and pulled him inside the house," and then the door slammed shut. Officer JB used his police radio to call for assistance from security forces personnel at the Base Defense Operations Control Center "as well as advising them that [they] had a barricaded suspect."

Officer JB testified when he responded to Appellant's residence his initial "concern was the safety and welfare of everyone on scene." He acknowledged on cross-examination by trial defense counsel that if Appellant had complied with being "detained and handcuffed," he would have "investigated" the alleged order violation. Trial defense counsel asked if Appellant's "custody status" would have changed at some point to "assault on a police officer." Officer JB responded if he had been able to place Appellant into custody after the assault, Appellant's "custody [status] would have changed to [']apprehended for assault on a police officer.[']"

**2. Standard of Review**

A Court of Criminal Appeals "may affirm only such findings of guilty" as it "finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1). We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). To reach a determination of legal sufficiency, there must be some competent evidence in the record "from which the [trier of fact was] entitled to find beyond a reasonable doubt, the existence of every element of the offense charged." *United States v. Wilson*, 6 M.J. 214, 215 (C.M.A. 1979) (internal quotation marks and citation omitted).

An examination for legal sufficiency "involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (internal quotation marks and citation omitted). "In determining whether *any* rational trier of fact could have determined that the evidence at trial established guilt beyond a reasonable doubt, [this court is] mindful that the term 'reasonable doubt' does not mean that the evidence must be free from any conflict or that the trier of fact may not draw reasonable inferences from the evidence presented." *Id.* (citation omitted). The Government can meet its burden of proof

with circumstantial evidence. *Id.* (citations omitted). When examining the evidence in the light most favorable to the prosecution, "a rational factfinder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that an element was proven. *United States v. Long*, 81 M.J. 362, 369 (C.A.A.F. 2021) (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)).

### 3. Elements of Resisting Apprehension

Appellant was found guilty of resisting apprehension by Officer JB in violation of Article 87a, UCMJ. For Appellant to be found guilty of this offense, as charged in Specification 1 of Charge I, the Prosecution was required to prove three elements beyond a reasonable doubt: (1) that Officer JB attempted to apprehend Appellant; (2) that Officer JB was authorized to apprehend Appellant; and (3) that Appellant actively resisted the apprehension. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 12.b.(1).

"Apprehension is the taking of a person into custody." Article 7(a), UCMJ, 10 U.S.C. § 807(a); *see also MCM*, pt. IV, ¶ 12.c.(1)(a); Rule for Courts-Martial (R.C.M.) 302(a)(1). "Apprehension is the equivalent of 'arrest' in civilian terminology." R.C.M. 302(a)(1), Discussion; *accord United States v. Harris*, 29 M.J. 169, 170 (C.M.A. 1989). An "apprehension" is distinct from the "detention of a person for investigative purposes," in that probable cause is required to apprehend. R.C.M. 302(a)(1), Discussion; *see also* R.C.M. 302(c) (requiring probable cause to apprehend). Conversely, an "investigative detention" does not require probable cause, "normally involves a relatively short period," and does not permit an extensive search of the detainee. R.C.M. 302(a)(1), Discussion.

Under Article 7(b), UCMJ, 10 U.S.C. § 807(b), "[a]ny person authorized under regulations governing the armed forces to apprehend persons subject to [the UCMJ] or to trial thereunder may do so upon reasonable belief that an offense has been committed and that the person apprehended committed it." Further, "[a] person subject to the UCMJ or trial thereunder may be apprehended for an offense triable by court-martial upon probable cause to apprehend." R.C.M. 302(c). Probable cause to apprehend "exists when there are reasonable grounds to believe that an offense has been or is being committed and the person to be apprehended committed or is committing it." *Id.*

A "specific intent to apprehend" is "necessary evidence" to convict. *Harris*, 29 M.J. at 171. Stated differently, the crime of resisting apprehension requires that "there must have been a 'specific intent' on the part of the person attempting the apprehension." *Id.* (citation omitted). However, evidentiary sufficiency to affirm a conviction for this offense "does not turn on the police officer's subjective motive." *Id.* Instead, "[w]hat matters is what [the officer] communicated to the appellant." *Id.* (citing *United States v. Sanford*, 12 M.J. 170, 174 (C.M.A.

1981)). "An apprehension is made by clearly notifying the person to be apprehended that person is in custody," and such notice may be verbal or "implied by the circumstances." R.C.M. 302(d)(1); *see also Harris*, 29 M.J. at 171 (observing that notice of apprehension under R.C.M. 302(d)(1) is an "objective standard" and "may be implied by the circumstances").

In evaluating whether an appellant had "clear notice of the apprehension which he was charged with resisting," the United States Court of Appeals for the Armed Forces (CAAF) has stated "[t]he critical question [for legal sufficiency] . . . is whether the evidenced circumstances . . . were such that a rational person could find beyond a reasonable doubt that appellant knew he was being apprehended." *United States v. Diggs*, 52 M.J. 251, 255 (C.A.A.F. 2000) (citing *Jackson*, 443 U.S. at 319).

An appellant's "resistance must be active, such as assaulting the person attempting to apprehend." *MCM*, pt. IV, ¶ 12.c.(1)(c). "Mere words of opposition, argument, or abuse, and attempts to escape from custody after the apprehension is complete, do not constitute the offense of resisting apprehension although they may constitute other offenses." *MCM*, pt. IV, ¶ 12.c.(1)(c).

### 4. Analysis

Both at trial and on appeal, the Government relied on the theory that Officer JB initially sought to apprehend Appellant when he tried to place handcuffs on Appellant's wrists for refusing to comply with the commander's order to relinquish his firearms. The Government did not argue at trial, and does not argue on appeal, that Appellant resisted apprehension for the crime of assault. Trial counsel argued that Officer JB's verbal commands to Appellant to turn around and put his hands behind his back gave Appellant notice of apprehension.[9] Trial counsel argued Appellant's resistance to apprehension began with

---

[9] The Prosecution's argument at trial was less nuanced than the Government's argument on appeal. During closing argument, trial counsel made no obvious distinction between apprehension or detention. Trial counsel initially argued Appellant knew he would be detained if he failed to comply with the order to relinquish his firearms, describing the conduct as follows: "[Officer JB] tells [Appellant] there is an order from the commander and if you don't comply with that order you will be temporarily detained when we take these firearms." In the same argument, trial counsel argued that Officer JB's initial attempt to handcuff Appellant constituted attempted apprehension: "So [Officer JB] tries to apprehend [Appellant] by walking towards him, he has handcuffs on his utility belt, he says turn around [and] put your hands behind [your] back, [Appellant]'s about to be apprehended."

his failure to comply with Officer JB's verbal commands and his resistance included the swing he took at Officer JB's face with a closed fist.[10] In the Government's view, as briefed in its answer to the assignment of error, "[b]ecause the commander's order was clearly communicated to Appellant, and Appellant made clear he would not follow it, Officer JB had sufficient grounds to apprehend" Appellant for violation of that order.

We have examined the record of trial in light of the Government's theory with deference to a rational factfinder, drawing every reasonable inference that may be made from the evidence in the Government's favor. *Robinson*, 77 M.J. at 297–98; *Barner*, 56 M.J. at 134. Resolution of this assignment of error turns on whether it was apprehension, as distinct from detention, that Appellant resisted, and, if so, whether the Government proved beyond a reasonable doubt that Appellant was aware of that apprehension when he failed to comply with Officer JB's directions and then swung at Officer JB's face. In our evaluation of the evidence in the case before us, we are not convinced a rational trier of fact could find that Officer JB attempted to apprehend Appellant for violation of the commander's order. Instead, the evidence shows Officer JB's purpose, and the actual notice to Appellant, was to simply *detain* Appellant to allow a peaceful removal of firearms from his home.

To begin, when Appellant answered the door, Officer JB did not have a warrant or prior authorization to apprehend Appellant for an offense that might have warranted investigation, nor was there an outstanding warrant or authorization to apprehend. Officer JB's trial testimony established he was unaware of any criminal case pending against Appellant. Officer JB testified about a conversation he had with Appellant's first sergeant moments before they knocked on Appellant's door. He was aware the NCOs "had an order from their commander to confiscate the firearms for storage in the arms room." During that conversation, Officer JB stated that "safety of everybody there" was "their first duty." Officer JB testified that he told the first sergeant that if Appellant refused to surrender those firearms, then Officer JB "could *detain* [Appellant], *not apprehend*, but *detain*, pending an investigation [for violation] of Article 92, [UCMJ,] failure to obey a lawful order." (Emphasis added).

Officer JB's testimony demonstrates he understood there was a legal difference between detaining Appellant and apprehending him. He believed that the former was temporary such as holding someone for an investigative reason,

---

[10] After findings were announced, and during argument on the motion whether the resisting apprehension and assault specifications were an unreasonable multiplication of charges for sentencing, trial counsel explained "that the resisting apprehension *was a number of things*." (Emphasis added). However, trial counsel explained "the gouging of the eye portion is not at all part of the resisting [apprehension]."

while the latter was more formal, signifying charges were imminent. Even after Officer JB observed Appellant's "pre-assault" indicators, his purpose in handcuffing Appellant at that point was detention. He testified his concern was everyone's safety and welfare and that "[g]iven the pre-assault indicators, my intention was to detain [Appellant] so that I can *investigate* . . . whether this order existed, you know, what was going on with it."[11] (Emphasis added). Officer JB's purpose in detaining Appellant is consistent with information the first sergeant told Appellant after Appellant answered the door. After Appellant asked, "What happens next," the first sergeant told Appellant that Officer JB "would detain him and he would remove the weapons." At no time was Appellant told that he was under apprehension, or would be, for violation of his commander's order or another offense.

In *Harris*, the CAAF's predecessor court set aside an appellant's conviction for resisting apprehension despite the fact he had led a military police officer on a high-speed chase, and later fled on foot after the officer shouted, "Hold it, Military Police." 29 M.J. at 170. The court's analysis turned on the police officer's testimony that he did not intend to apprehend the appellant, but instead, had only wanted to stop the appellant and determine whether to apprehend him. *Id.* at 171. Like the police officer in *Harris*, Officer JB initially intended only to detain Appellant, and then only if necessary. Officer JB's stated purpose when he initially appeared in uniform on Appellant's front stoop was to ensure the safety and security of Appellant and the two NCOs who were charged with carrying out their commander's order to take Appellant's firearms from his residence and put them in the armory.

As discussed earlier in this opinion, in evaluating the question of circumstantial notice of apprehension, the CAAF instructs that "[t]he critical question . . . is whether the evidenced circumstances . . . were such that a rational person could find beyond a reasonable doubt that appellant knew he was being apprehended." *Diggs*, 52 M.J. at 255 (citation omitted). Such knowledge turns on proof an appellant had "clear notice of the apprehension which he was charged with resisting." *Id.* (citations omitted). In *Diggs*, the CAAF reviewed the legal sufficiency of a conviction for resisting apprehension. *Id.* at 252. The

---

[11] At one point, Officer JB answered "yes" to a question trial defense counsel asked that was predicated on him "moving in to apprehend [Appellant]." At another point when answering a question from trial defense counsel, Officer JB acknowledged he wanted to "arrest" Appellant so that he could conduct an investigation into the alleged Article 92, UCMJ, order violation. We agree with Appellant that well prior to this, Officer JB was consistent in stating in his own words that he needed to detain Appellant to ensure the safety of everybody on scene or conduct an investigation. When combined with Officer JB's testimony of what it means to "apprehend" versus "detain," his overall testimony evidenced an intent to detain.

*Diggs* appellant was discovered hiding in the bedroom closet of another NCO's wife. *Id.* Upon that NCO's discovery of the appellant, the appellant offered to turn himself in to military police. *Id.* at 255. However, the apprehending NCO who discovered the appellant insisted that the appellant accompany the NCO to the police station. *Id.* In that case there was evidence that the apprehending NCO "rejected [the] appellant's offer to turn himself in" such that the resistance the appellant later demonstrated met the elements for resisting apprehension. *Id.* In finding the conviction legally sufficient, the CAAF observed that the appellant had "admitted his wrongdoing and that he should be placed in the custody of military police. This was not a situation where a servicemember was simply being questioned or investigated for a prior offense." *Id.*

Unlike the appellant in *Diggs* who acceded to *apprehension*, Appellant was made aware only that he was being *detained*. His first sergeant told him that was what would happen if he refused to comply with their commander's order. On these facts, no rational trier of fact could conclude that Officer JB's initial purpose was anything other than to possibly detain Appellant for the safety of everyone present and to investigate the circumstances of the order violation. According to Officer JB's uncontradicted testimony, Appellant's manifestation of pre-assault indicators did not change the officer's intent. Contrary to its theory at trial and on appeal, the Government did not prove beyond a reasonable doubt that Officer JB attempted to apprehend Appellant when Appellant swung at him, much less that Appellant had clear notice he was being apprehended and not detained in line with Officer JB's testimony.

To be sure, Officer JB's purpose changed during the physical altercation on Appellant's stoop. He testified that if Appellant had not eluded him at the doorstep after swinging at his face with a closed fist, he would have apprehended Appellant for assault on a police officer. However, the Government did not argue either at trial or on appeal that Appellant resisted apprehension for the offense of assault, or that Officer JB attempted to apprehend Appellant for any suspected UCMJ violation other than his refusal to obey his commander's order to relinquish his firearms.

An appellate court may not "affirm[ ] a conviction based on a different legal theory than was presented at trial." *United States v. English*, 79 M.J. 116, 122 (C.A.A.F. 2019) (citations omitted). For aforementioned reasons, we find Appellant's conviction legally insufficient for failure to prove beyond a reasonable doubt that Appellant had clear notice of apprehension. Having found the conviction legally insufficient, the court does not address Appellant's claim of factual insufficiency.

This court may reassess a sentence only if it may reliably determine that, absent the error, the sentence would have been "at least of a certain magnitude." *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000) (citation omitted).

Having considered the entire record, including the fact that the military judge imposed a segmented sentence of three months' confinement for Appellant's conviction for Specification 1 of Charge I, we conclude that we are able to reassess the sentence in accordance with the principles articulated in *United States v. Winckelmann*, 73 M.J. 11, 15–16 (C.A.A.F. 2013), and *United States v. Sales*, 22 M.J. 305, 307–08 (C.M.A. 1986). We are confident, moreover, that absent the error, an appropriate sentence would have included the other components of the adjudged sentence, including a dishonorable discharge. Accordingly, we find that absent the error, the adjudged sentence would have included at least a dishonorable discharge, 27 months of confinement, and reduction to the grade of E-1.

## B. Announcement of Sentence

Appellant contends that the length of his adjudged confinement is 26 months vice the 30 months listed in the entry of judgement. We disagree.

### 1. Additional Background

As noted earlier in this opinion, Appellant was convicted of desertion, as charged in the Specification of Charge IV; he was also convicted of failure to obey a lawful order that limited personnel to stay within a specified distance from Dyess Air Force Base, as charged in the Specification of Charge V. During sentencing proceedings, on Appellant's motion, the military judge found these offenses were "an unreasonable multiplication of charges for sentencing purposes." He ruled, "As such, they will be merged for sentencing purposes."

When announcing sentence on 6 March 2021, the military judge announced a term of confinement for each of Appellant's ten convictions. For the Specification of Charge IV (desertion) he adjudged confinement for four months. For the Specification of Charge V (failure to obey a lawful order) he adjudged confinement for one month. Tallying both terms (5 months) and the combined terms adjudged for the other eight specifications (26 months), the total confinement adjudged was 31 months. However, in announcing sentence, the military judge announced, also, that "[a]ll sentences to confinement will run consecutively, with the exception of Charge IV and Charge V, which will run concurrently pursuant to R.C.M. 1002(d)(2)(B)(iii)."

The military judge did not announce the total period of confinement that Appellant was to serve for all ten specifications after taking his application of R.C.M. 1002(d)(2)(B)(iii) into consideration. However, in his Statement of Trial Results dated the same day that he announced sentence, the military judge stated the total adjudged confinement as 30 months. The entry of judgment signed by the military judge on 26 March 2021 also stated that Appellant was to serve a total confinement period of 30 months. Also, both the Statement of Trial Results and entry of judgment stated that each of the confinement terms

for the Specifications of Charges IV and V were concurrent with the other "pursuant to R.C.M. 1002(d)(2)(B)(iii)."

### 2. Analysis

The Government argues that 30 months' confinement is correct because the military judge merged the sentences for Charge IV and Charge V and intended each to run concurrently with the other. In the Government's telling, "effectively, the one-month sentence of Charge V would be subsumed by the four-month sentence of Charge IV." The Government explains that the correct way to tally Appellant's total confinement is to combine the 4 months' confinement for these merged specifications, and the 26 months' confinement for the remaining specifications. The entry of judgment, the Government argues, is correct as a result.

Appellant takes a different view. He argues that the Government would be correct if one assumes that the term of confinement for each Specification of Charges IV and V was to run concurrently *only with the other*. He argues that, as announced, the combined confinement terms for Charges IV and V (5 months) run concurrently *with the terms of confinement for all eight specifications* (26 months). As a result, the tally of Appellant's total confinement is 26 months vice the 30 months listed in the entry of judgment.

We conclude that the Government's view is correct because it has support in the record. In announcing that the confinement terms for the Specifications of Charges IV and V would run concurrently, the military judge explained his decision was "pursuant to R.C.M. 1002(d)(2)(B)(iii)." This rule states that "[t]he terms of confinement for two or more specifications shall run concurrently . . . when the accused is found guilty of two or more specifications and the military judge finds that the charges or specifications are unreasonably multiplied." Here, the military judge merged two, and only two, specifications for an unreasonable multiplication of charges: the Specifications of Charges IV and V. No other charges or specifications were merged for purposes of sentencing by ruling of the military judge.

We are confident that the logical conclusion from the military judge's reference to R.C.M. 1002(d)(2)(B)(iii) when he announced sentence is that the terms of confinement for each Specification of Charges IV and V would run concurrently with the other. By citing this rule, the military judge was clear that the only terms of confinement that would run concurrently were for those specifications he merged for sentencing. Because the other eight specifications were not included in the military judge's merger ruling, the merged term of confinement for Charges IV and V (four months) runs consecutively, not concurrently, with the combined 26 months' confinement adjudged for those eight

specifications. It follows then that the 30 months' confinement tallied in the entry of judgment is correct.

In reaching this result, we hew closely to the principle that "[a] sentence need not be so clear as to eliminate every doubt, but sentences should be clear enough to allow an accused to ascertain the intent of the court or of the members." *United States v. Stewart*, 62 M.J. 291, 294 (C.A.A.F. 2006) (citation omitted). In that regard, the sentence "should reveal with fair certainty the intent of the court and exclude any serious misapprehensions by those who must execute them." *Id.* (internal quotation marks and citation omitted). "A sentence that is so ambiguous that a reasonable person cannot determine what the sentence is may be found illegal." *Id.* (citing *United States v. Earley*, 816 F.2d 1428, 1430 (10th Cir. 1987)). Lastly, we note that neither Appellant nor trial defense counsel took issue with the military judge's sentence, nor did they express any concern about the announcement or ask the military judge to "call the court-martial into session to correct the announcement." *See* R.C.M. 1007(c). Moreover, Appellant did not bring a post-trial motion "to correct a computational, technical, or other clear error in the sentence" within five days after receipt of the entry of judgment. *See* R.C.M. 1104(b)(1)(C) and (b)(2)(C).

Because the military judge referenced R.C.M. 1002(d)(2)(B)(iii), we are convinced that the sentence was not ambiguous, and that the entry of judgment correctly reflects Appellant's adjudged confinement. Therefore, relief is not warranted on this issue.

### III. Conclusion

The findings of guilty to Specification 1 of Charge I and Charge I are **SET ASIDE**. Accordingly, Charge I and its underlying Specification 1 are **DISMISSED WITH PREJUDICE**. We reassess Appellant's sentence to a dishonorable discharge, 27 months of confinement, and reduction to the grade of E-1. The remaining findings and the sentence as reassessed are correct in law and fact, and no other error materially prejudicial to a substantial right of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the remaining findings and the sentence as reassessed are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court