*This opinion is subject to revision before publication.*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

———————

## UNITED STATES
Appellee

**v.**

## Fernando M. BROWN, Chief Machinery Technician
United States Coast Guard, Appellant

### No. 22-0249
Crim. App. No. 001-69-21

Argued January 24, 2023—Decided January 10, 2024

Military Judge: Ted R. Fowles

For Appellant: *Scott Hockenberry*, Esq. (argued); *Lieutenant Commander Kristen R. Bradley* (on brief).

For Appellee: *Lieutenant Commander Daniel P. Halsig Jr.* (argued); *Lieutenant Elizabeth Ulan.*

Chief Judge OHLSON announced the judgment of the Court, in which Judge SPARKS, Judge MAGGS, Judge HARDY, and Judge JOHNSON joined in part. Judge SPARKS filed a separate opinion concurring in part and dissenting in part, in which Judge JOHNSON joined. Judge HARDY filed a separate opinion concurring in part and dissenting in part, in which Judge MAGGS joined in part.

———————

Chief Judge OHLSON announced the judgment of the Court.

Sometimes a seemingly simple statute can be devilishly difficult to interpret. As reflected by the various opinions in this case, that certainly is true with Article 91(3), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 891(3) (2018), which prohibits disrespect towards a warrant, noncommissioned, or petty officer. Nonetheless, this case resolves two key points. First, a majority of this Court holds that an accused servicemember can be convicted under Article 91(3) even if his or her disrespectful conduct occurs outside the physical presence of the victim. Importantly, that means that disrespectful language or behavior towards a warrant, noncommissioned, or petty officer can be criminally actionable even when it is *remotely* conveyed using a digital device such as a smartphone and even when the disrespectful language or behavior is conveyed via social media. And second, a majority of this Court holds that under Article 91(3), servicemembers can only be held criminally liable if *at the time they conveyed* the disrespectful language or behavior the victim was *then* in the execution of his or her office. The reasons for these conclusions are explained below.

**I. Background**

Appellant was stationed aboard the United States Coast Guard Cutter (USCGC) Polar Star. Senior Chief Petty Officer (SCPO) K.B., the ship's Command Senior Chief, created a text group consisting of the cutter's eleven chief petty officers. This text group—colloquially referred to as the "Chief's Mess"—was designed to pass along work-related information because the crew was geographically separated while the cutter was in dry dock. There was no explicit order to participate in the text group. However, during his court-martial testimony SCPO K.B. agreed with the trial counsel that it would be inappropriate for a chief petty officer to ignore a "crew issue" even if it was raised outside of work hours. All group members used their personal cell phones to access the texts. Although the text

group sometimes encompassed "some levity" and "friendly conversations," it was otherwise "all work-related."

The three instances of disrespect for which Appellant was convicted consisted of messages he sent to the text group which contained either modified pictures of, or specific references to, one of his three fellow chief petty officers: Chief Petty Officer (CPO) J.D., SCPO K.B., and CPO S.C. The first instance occurred when CPO J.D., while working on the cutter, sent a picture of himself to the text group. Appellant modified the photo by adding a crude drawing of male genitalia to CPO J.D.'s forehead and then resent the image to the group. CPO J.D. was "down in dry dock" when he received the message from Appellant. Upon seeing that he received the text, CPO J.D. checked his phone to "keep track of what was going on throughout the text message stream, [and to see] if there was anything . . . pertinent."

The second instance occurred after SCPO K.B. missed a chief's call. Appellant sent a picture which depicted a scantily clad man along with a text stating: "Found out why [K.B.] missed chiefs [sic] call." This text was sent at 7:39 p.m., outside of regular duty hours.

The third instance occurred when Appellant sent a picture of CPO S.C.'s high school yearbook photo with the added caption: "Voted most likely to steal your bitch." CPO S.C. identifies as lesbian, a fact which was known among the Chief's Mess. At the time she received the disrespectful message she was on convalescent leave. CPO S.C. testified that she felt embarrassed when Appellant posted the photo to the group.

A special court-martial composed of a military judge sitting alone convicted Appellant, contrary to his pleas, of three specifications of disrespect towards a noncommissioned officer in violation of Article 91(3), and one specification of sexual harassment in violation of Article 92, UCMJ, 10 U.S.C. § 892 (2018). The military judge sentenced Appellant to reduction to E-4, a reprimand, and restriction for thirty days. The convening authority approved

the sentence. Upon application of Appellant, the Judge Advocate General of the Coast Guard sent the case to the United States Coast Guard Court of Criminal Appeals (CCA) pursuant to Article 69(d), UCMJ, 10 U.S.C. § 869(d) (2018). The CCA set aside and dismissed the Article 92 charge and its specification, affirmed the remaining findings, and reassessed the sentence, reducing Appellant to E-6 but otherwise affirming the sentence. We granted review of the following issue:

> Are Appellant's convictions under Article 91 legally insufficient where there is an absence of evidence that the charged conduct occurred in the sight, hearing, or presence of the alleged victims while they were in the execution of their office?

*United States v. Brown*, 83 M.J. 64 (C.A.A.F. 2022) (order granting review). We affirm in part and reverse in part the decision of the CCA.

## II. Standard of Review

Questions of legal sufficiency are reviewed de novo. *United States v. Wilson*, 76 M.J. 4, 6 (C.A.A.F. 2017) (citing *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011)). In reviewing for legal sufficiency, this Court considers "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation omitted) (internal quotation marks omitted).

Questions of statutory construction are also reviewed de novo. *Wilson*, 76 M.J. at 6 (citing *United States v. Atchak*, 75 M.J. 193, 195 (C.A.A.F. 2016)). "[I]t is axiomatic that '[i]n determining the scope of a statute, we look first to its language.'" *United States v. Murphy*, 74 M.J. 302, 305 (C.A.A.F. 2015) (alterations in original) (quoting *United States v. Kearns*, 73 M.J. 177, 181 (C.A.A.F. 2014)). "The inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *United States v. McPherson*, 73 M.J. 393, 395 (C.A.A.F. 2014) (internal quotation marks omitted) (quoting *Barnhart v. Sigmon Coal Co., Inc.* 534 U.S. 438, 450 (2002)). Of

note, "we are not bound by the President's interpretation of the elements of substantive offenses." *Wilson*, 76 M.J. at 6 (citing *United States v. Davis*, 47 M.J. 484, 486 (C.A.A.F. 1998)). Nonetheless, "when the President's narrowing construction of a statute does not contradict the express language of a statute, it is entitled to some deference, and we will not normally disturb that construction." *Id.* (citing *Murphy*, 74 M.J. at 310).

### III. Discussion

The relevant text of Article 91(3) states: "Any warrant officer or enlisted member who . . . treats with contempt or is disrespectful in language or deportment toward a warrant officer, noncommissioned officer, or petty officer, while that officer is in the execution of his [or her] office . . . shall be punished as a court-martial may direct."

Appellant's argument before this Court can largely be distilled into two prongs: (1) Do the provisions of Article 91(3) encompass those instances where an accused *remotely* uses digital communication technology? And if so, (2) does the victim have to be "in the execution of . . . office" at the time *the accused conveys* the disrespectful language or behavior, or is it sufficient for the victim to be in the execution of office at the time *the victim views or hears* the disrespectful language or behavior? We address each of these prongs in turn.

### A. Prong One: Within Sight, Hearing, or Presence[1]

As shown above, the language of Article 91(3) is quite broad. However, the elements supplied by the President narrow the scope of the offense. In pertinent part, the elements make it a crime for "a warrant or enlisted member" to use disrespectful language or behavior "toward *and*

---

[1] Judge Sparks and Judge Johnson concur with this section. *See United States v. Brown*, 83 M.J. __, __ (1) (C.A.A.F. 2023) (Sparks, J., with whom Johnson, J., joins, concurring in part and dissenting in part). Judge Maggs and Judge Hardy dissent from this section. *See Brown*, 83 M.J. at __ (7-8) (Hardy, J., with whom Maggs, J., joins in part, concurring in part and dissenting in part).

*within sight or hearing* of a [victim] warrant officer, non-commissioned, or petty officer." *Manual for Courts-Martial, United States* pt. IV, para. 17.b.(3)(c) (2019 ed.) (*MCM*) (emphasis added); *see also id.* para. 17.c.(5) (explaining that the word " '[t]oward,' " as used in subsection (c), "requires that the *behavior and language* be within the sight or hearing of the warrant, noncommissioned, or petty officer concerned" (emphasis added)). Because the President had the authority to constrict the scope of the statute in this manner, it is the President's language contained within the elements of the *MCM* that guides our analysis. *Wilson*, 76 M.J. at 6.

Appellant argues that an offense under Article 91(3)—particularly in light of the elements supplied by the President—can occur only if the accused and the victim were in "physical proximity" at the time of the charged conduct. Thus, it would appear that Appellant's position is that a servicemember can convey to a victim recipient a disrespectful and public message through any medium—text, telephone, email, video communication, social media, etc.—yet avoid punishment if the offending sender was not physically proximate to the victim when the conduct occurred.

It is essential to note, however, that language requiring physical proximity between an accused and a victim is absent from both the statutory language of Article 91(3) and from the listed elements.[2] Rather, all that is required

---

[2] The President has defined the elements of Article 91(3) as:

> (a) That the accused was a warrant officer or enlisted member;

> (b) That the accused did or omitted certain acts, or used certain language;

> (c) That such behavior or language was used toward and within sight or hearing of a certain warrant, noncommissioned, or petty officer;

> (d) That the accused then knew that the person toward whom the behavior or language was directed was a warrant, noncommissioned, or petty officer;

under element (c) is that the *disrespectful language or behavior* was within the sight or hearing of the victim. Indeed, we note that the explanation of Article 91 refers the reader back to the discussion of "disrespect" in Article 89, UCMJ,[3] which states that *presence "is not essential."*[4] *MCM* pt. IV, para. 15.c.(2)(c) (emphasis added). In other words, regardless of physical proximity, this element is met so long as an accused causes his or her disrespectful language or behavior to come within the sight or hearing of the victim.

Therefore, we hold that disrespectful language or behavior towards a warrant, noncommissioned, or petty officer can be criminally actionable even when it is remotely conveyed using a digital device and even when the disrespectful language or behavior is conveyed via social media.

---

    (e) That the victim was then in the execution of office; and

    (f) That under the circumstances the accused, by such behavior or language, treated with contempt or was disrespectful to said warrant, noncommissioned, or petty officer.

*MCM* pt. IV, para. 17.b.(3)(a)-(f). There are two additional elements if the victim was the *superior* noncommissioned or petty officer of the accused. *Id.* para. 17.b.(3)(g)-(h). These additional elements apply only to the specification regarding SCPO K.B. These additional elements are not at issue in this case.

[3] Disrespect toward superior commissioned officer; assault of superior commissioned officer, Article 89, UCMJ, 10 U.S.C. § 889 (2018).

[4] The President's explanatory text accompanying Article 91 states: "Article 91 has the same general objects with respect to warrant, noncommissioned, and petty officers as Articles 89 and 90 have with respect to commissioned officers, namely, to ensure obedience to their lawful orders, and to protect them from violence, insult, or disrespect." *MCM* pt. IV, para. 17.c.(1).

## B. Prong Two: In the Execution of Office[5]

In order for disrespectful conduct to be a chargeable offense, element (e) of Article 91(3) requires the following: "That the victim was *then* in the execution of office."[6] *MCM* pt. IV, para. 17.b.(3)(e) (emphasis added). We conclude that this language requires the victim to be in the execution of his or her office *at the time the accused engages in the disrespectful behavior*. We come to this conclusion based on our textual analysis of two elements listed in the *MCM*.

Elements (d) and (e) list two further conditions that are necessary to find a servicemember criminally liable under Article 91(3). These two elements require the government to show that "the accused *then* knew that the person toward whom the behavior or language was directed was a warrant, noncommissioned, or petty officer" and that "the victim was *then* in the execution of office." *MCM* pt. IV, para. 17.b.(3)(d)-(e) (emphasis added). It is clear that under element (d), the word "then" imposes a requirement that the accused knew the military status of the victim *at the time the accused engaged in the disrespectful behavior. See id.* para. 17.c.(2) ("All of the offenses prohibited by Article 91 require that the accused have actual knowledge that the victim was a warrant, noncommissioned, or petty officer."); *cf. United States v. Biggs*, 22 C.M.A. 16, 18, 46 C.M.R. 16, 18 (1972) (concluding there was sufficient evidence "to support the court's determination that, *at the time of the*

---

[5] Judge Maggs and Judge Hardy concur with this section. *See Brown*, 83 M.J. at __ (7-9) (Hardy, J., with whom Maggs, J., joins in part, concurring in part and dissenting in part). Judge Sparks and Judge Johnson dissent from this section. *See Brown*, 83 M.J. at __ (1-4) (Sparks, J., with whom Johnson, J., joins, concurring in part and dissenting in part).

[6] Paragraph 17 of Part IV of the *MCM* refers the reader to Paragraph 15 for a discussion of the phrase " 'in the execution of his office.' " *MCM* pt. IV, para. 17.c.(5). "An officer is in the execution of office when engaged in any act or service required or authorized by treaty, statute, regulation, the order of a superior, or military usage." *Id.* para. 15.c.(3)(f).

*offenses* . . . the accused knew the military identity" of his victims (emphasis added)).

Element (e) also uses the word "then." It requires that "the victim was *then* in the execution of office." *MCM* pt. IV, para. 17.b.(3)(e) (emphasis added). Because of the repeated use of the same word "then" in consecutive *MCM* elements, we conclude this word must have the same meaning and effect. *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019) ("This Court does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes."). Therefore, reading these elements together demonstrates that the victim must be "in the execution of office" *at the time the accused engaged in the disrespectful behavior*.

This interpretation of element (e) is bolstered by examining the statutory language upon which it is predicated. The relevant portion of Article 91(3) prohibits an enlisted member from engaging in disrespectful language or behavior towards a petty officer "*while* that officer is in the execution of his office." (Emphasis added.) The word "while," when used as a conjunction, means "during the time that."[7] *See also Leighton Techs. LLC v. Oberthur Card Sys., S.A.*, 358 F. Supp. 2d 361, 386 (S.D.N.Y. 2005) (defining "while" to mean "simultaneously or concurrently"). The best interpretation of this language within Article 91(3) is that it imposes a "concurrency requirement" regarding the conduct of the accused on the one hand and the official status of the victim on the other. Therefore, Appellant's convictions under Article 91 can stand only if the evidence shows that SCPO K.B., CPO J.D., and CPO S.C. were in the execution of their office *during the time that* Appellant conveyed his disrespectful language or behavior.[8]

---

[7] *While*, *Merriam-Webster Unabridged Online Dictionary*, https://unabridged.merriam-webster.com/unabridged/while (last visited Oct. 13, 2023).

[8] We acknowledge that our reading of the elements creates situations in which a warrant officer or enlisted member cannot be held criminally liable under Article 91(3) despite using

### C. Application of the Second Prong to this Case[9]

Having resolved the meaning of Article 91(3), we now must determine its application to the facts of Appellant's case.

### 1. SCPO K.B. and CPO S.C.

It is true that when conducting a legal sufficiency review, "the relevant question an appellate court must answer is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Herrmann*, 76 M.J. 304, 307 (C.A.A.F. 2017) (citation omitted) (internal

blatantly disrespectful language or behavior towards a warrant, noncommissioned, or petty officer if the putative victim was not in the execution of his or her office at the time of the disrespectful act. Nevertheless, it is not the role of this Court to expand the reach of either statutory language passed by Congress or elements of the articles promulgated by the President in order to avoid anomalous or undesirable results. *Cf. Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration."). However, Congress or the President may, of course, revise the current language of Article 91(3) and/or its elements in order to more comprehensively address disrespectful conduct if they deem it appropriate to do so.

**9** In a November 2, 2023, petition for reconsideration, Appellant argued that the CCA does not have factfinding authority in this instance because this case arrived at the lower court under Article 69, UCMJ, rather than under Article 66, UCMJ, 10 U.S.C. § 866 (2018). Appellant is correct. Article 69(e) precluded the CCA from factfinding, and thus this Court's lead opinion could not rely on the CCA's factfinding. However, we note that the lead opinion did not rely exclusively upon the CCA's factual finding in reaching its conclusion in this case. Indeed, eliminating the CCA's findings of fact does not change the lead opinion's conclusions because the evidence contained in the record of trial was sufficient to uphold Appellant's conviction regarding CPO J.D. We have, however, revised this opinion and removed language referring to the CCA's factfinding ability.

quotation marks omitted). But despite this generous standard, it must be noted that in the instant case the Government failed to introduce evidence demonstrating that two of the victims—SCPO K.B. and CPO S.C.—were on duty when Appellant sent the texts. For example, the Government did not elicit testimony from SCPO K.B. and CPO S.C. that they opened the texts concurrent with Appellant sending them. Therefore, these two convictions cannot withstand appellate scrutiny. Accordingly, we set aside the findings pertaining to SCPO K.B. and CPO S.C.

### 2. CPO J.D.

Regarding the remaining victim, CPO J.D. testified he was "down in dry dock" when he "received a message" in the Chief's Mess group text. His testimony further reflects that he checked his phone when he received this message to "keep track of what was going on throughout the text message stream, [to see] if there was anything . . . pertinent." And upon opening the group text, CPO J.D. discovered Appellant's disrespectful text. Thus, when drawing "every reasonable inference from the evidence of record in favor of the prosecution," *United States v. Robinson*, 77 M.J. 294, 298 (C.A.A.F. 2018) (citation omitted) (internal quotation marks omitted), we conclude there is sufficient evidence that CPO J.D. was in the execution of his office at the time Appellant engaged in the disrespectful conduct. Accordingly, we affirm Appellant's conviction pertaining to CPO J.D.[10]

---

[10] In his petition for reconsideration, Appellant also argued that this Court cannot affirm his conviction under Specification 1, Charge I, because "Appellant's conduct has never been evaluated by a factfinder under the proper construction of the elements." Petition for Reconsideration at 1, *United States v. Brown*, No. 22-0249 (C.A.A.F. Nov. 2, 2023). The Court is unpersuaded by this argument. In this judge-alone trial, the military judge was the factfinder. And in issuing his special findings, the military judge held that "[a]t the time that [Appellant] *communicated* the digital photograph, which included a depiction of male genitalia, [CPO J.D.] was *then in the execution of his office.*" (Special Findings at 3.) (Emphasis added.) Such language

## IV. Judgment[11]

The decision of the United States Coast Guard Court of Criminal Appeals is affirmed as to Charge I and Specification 1 thereunder, but reversed as to Specifications 2 and 4 of Charge I and as to the sentence. The findings of guilty with respect to the latter two specifications are set aside and dismissed. The record is returned to the Judge Advocate General of the United States Coast Guard for remand to the Court of Criminal Appeals to either reassess the sentence based on the affirmed findings or order a sentence rehearing.

---

indicates that, in convicting Appellant of the offense at issue, the trier of fact did indeed apply the theory regarding the presidentially defined element (e) of Article 91(3) that was articulated in the lead opinion. Therefore, contrary to Appellant's argument, Appellant's conduct *has* been evaluated by a factfinder under the proper construction of the elements.

[11] Judge Maggs and Judge Hardy join with respect to setting aside the offenses involving SCPO K.B. and CPO S.C. but would also set aside the offense involving CPO J.D. *See Brown*, 83 M.J. at __ (9 & n.5) (Hardy, J., with whom Maggs, J., joins in part, concurring in part and dissenting in part). Judge Sparks and Judge Johnson join with respect to affirming the offense involving CPO J.D. but would also affirm the offense regarding SCPO K.B. *See Brown*, 83 M.J. at __ (4-5) (Sparks, J., with whom Johnson, J., joins, concurring in part and dissenting in part). Therefore, the judgment expressed here is supported by a majority of the Court. *Cf. Marks v. United States*, 430 U.S. 188, 193 (1977) (articulating that when a fragmented Court decides a case and no single rationale commands the majority, " 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds' " (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.))).

Judge SPARKS, with whom Judge Johnson joins, concurring in part and dissenting in part.

As noted by the lead opinion, Appellant's argument before this Court can be condensed into two prongs: (1) Do the provisions of Article 91(3), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 891(3) (2018), encompass those instances where an accused remotely uses digital communication technology? And if so, (2) does the victim have to be "in the execution of office" at the time the accused conveys the disrespectful language or behavior, or is it sufficient for the victim to be in the execution of office at the time the victim views or hears the disrespectful language or behavior?

First, I agree with the lead opinion that an accused servicemember can be convicted under Article 91(3), UCMJ, even if his or her disrespectful conduct occurs outside the physical presence of the victim. Under Appellant's interpretation of the elements, a servicemember could convey a disrespectful message through any medium to the victim recipient—text, telephone, mail, video communication, etc., yet avoid punishment simply because the offending sender was not physically proximate to the victim when the disrespectful conduct or language was committed or communicated. This result would plainly conflict with the article's intent and the overall statutory scheme: promoting good order and discipline via punishment of disrespect to noncommissioned officers. *See Manual for Courts-Martial, United* States, pt. IV, para 17.c.(1) (2019 ed.) (*MCM).*

My disagreement is with the lead's holding that under Article 91(3), UCMJ, the victim must be in execution of his or her office at the time the accused engages in the disrespectful conduct. For the reasons discussed below, in my view, the victim must be in the execution of his or her office at the time the victim views or hears the disrespectful conduct.

### I. In the Execution of Office

In order for disrespectful conduct to be a chargeable offense, element (e) of Article 91(3), UCMJ, requires: "That the victim was then in the execution of office." *MCM*, pt.

IV, para. 17.b.(3)(e). From Appellant's perspective there are two parts to the "execution of office" analysis: (1) does the language of the specification focus on when Appellant sent the texts, or when the texts were read or received; and (2) is there evidence that the victims were in " 'execution of [their] office' " at the appropriate time, or at all? (Alteration in original.)

As for the first part, I conclude that the language of Article 91, UCMJ, and the specifications in this case apply to when the victims read or received the texts. The language of the statute and the elements compel me to reject the notion that the operative focus is centered on when Appellant sends the text messages. The relevant elements state that "the accused did . . . or used certain language;" "[t]hat such behavior or language was used toward and within the sight or hearing of a certain . . . petty officer;" "[t]hat the accused then knew that the person toward whom the behavior or language was directed was a . . . petty officer;" and "[t]hat the victim was then in the execution of office." *MCM* pt. IV, para. 17.b.(3)(b)-(e). The important point here is that when Appellant engaged in the disrespectful conduct, he "then knew" that the victim was a noncommissioned officer and that the victim "was then" in the execution of office.[1] *Id*. It is tempting to read these provisions in the context of the classic situation where the target of the conduct or language instantly becomes aware of it because the offender and the victim are physically within each other's presence. However, Appellant was charged with either sending or distributing the images, and neither sending nor distributing are necessarily isolated or discrete acts occurring at one instantaneous point in time. Here, the act of sending or distributing was complete when the communications were in the possession of the recipients, i.e., when they were delivered. *See e.g., Distribute, Black's Law Dictionary* 508 (8th ed. 2004) ("[t]o deliver"). Thus, it is not necessary that the record reflect whether the victims were in execution of office when Appellant pressed send because it sufficiently

---

[1] Appellant does not challenge that he "knew" the victims were petty officers.

demonstrates that Appellant knew the victims would receive and read the texts, and that they would "then" be in execution of office when doing so. *See MCM* pt. IV, para. 17.b.(3)(b-e).

As to the second part, this Court has held that a servicemember may be in " 'execution of his office when engaged in any act or service required or authorized to be done by him, by statute, regulation, the order of a superior, or military usage.' " *United States v. Glaze*, 3 C.M.A 168, 172, 11 C.M.R. 168, 172 (1953) (quoting William Winthrop, *Military Law and Precedents* 571 (2d ed., Government Printing Office 1920) (1895)). Given that whether one is in "execution of office" is a factual inquiry, from a legal sufficiency standpoint, we are bound by the military judge's finding as a rational trier of fact. Although there was some joking in the group text, the record indicates that the primary purpose of the group text was for official work reasons. Accordingly, when the chief petty officers participated in the group chat, they were in effect working. *See e.g., Glaze*, 3 C.M.A. at 172, 11 C.M.R. at 172 (finding that the victim noncommissioned officer was in "execution of his office" when in charge of a supply tent despite simultaneously fraternizing and drinking alcohol with other noncommissioned officers); *see generally United States v. Diggs*, 52 M.J. 251, 256 (C.A.A.F. 2000) (supporting the notion that a servicemember need not be explicitly on duty in order to be in "execution of his office"); *United States v. Nelson*, 17 C.M.A. 620, 622-23, 38 C.M.R. 418, 420-21 (1968) (concluding an officer "in execution of his office" despite being off-duty and wearing civilian clothes when stopping two drunk soldiers from causing a scene in public).

Appellant is correct, however, that there is a temporal requirement relating to the disrespectful conduct or language occurring "within sight or hearing" of the victim and whether the victim is in " 'execution of [their] office,' " as those two conditions must occur contemporaneously. The question here is whether the military judge, could have

reasonably inferred that the victims read the text messages within a reasonable time after Appellant pressed "send."[2]

## II. Application

### a. Senior Chief Petty Officer (SCPO) K.B.

Prosecution Exhibit 9 indicates that Appellant sent the image to SCPO K.B. at 7:39 PM. The exhibit displays SCPO K.B.'s comments regarding his having missed a previous chiefs' meeting. Beneath his comment is the offending image sent by Appellant at 7:39 PM. SCPO K.B. confirmed that he received the text after working hours but did not respond to the sent image. However, SCPO K.B. testified that he found the image funny at the time he received it, presumably shortly after 7:39 PM. Given the importance he and the others placed on checking their phones regarding the group texts, his testimony supports the conclusion that he checked his phone a relatively short time after the text was sent. Thus, after viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found SCPO K.B. was in the execution of his office at the time he saw the text message. *See Wilson*, 76 M.J.at 6. Accordingly, I dissent from the lead's holding to the contrary and would affirm Appellant's conviction for this offense.

### b. Chief Petty Officer (CPO) J.D.

I agree with the lead opinion that CPO J.D. was in the execution of his office, albeit based on a different interpretation, when he opened the group text while being down at the dry dock. Accordingly, I concur that we should affirm Appellant's conviction pertaining to CPO J.D.

---

[2] Consider the following example. A servicemember leaves a disrespectful picture on a noncommissioned officer's desk early in the morning before the victim is at work, but the offender knows the victim will be there shortly as it is the victim's appointed place of duty. The offender caused the disrespectful picture to be within sight of the victim despite not being physically or temporally proximate. However, the victim saw the picture upon coming to the desk and was thus in the "execution of office" at that time. This scenario is no different than the case at hand, despite the technological differences.

**c. CPO S.C.**

As for CPO S.C., she testified that her light duty status prevented her from joining the crew while the ship was in dry dock. Nonetheless, she still felt obligated to carry out her duties as a chief petty officer. That included checking her phone when it notified her that a text from the chiefs' group had been received. However, even under my view and considering her response (Defense Exhibit A) to the image from her high school yearbook (Prosecution Exhibit 5) posted by Appellant, it is difficult to conclude the evidence is sufficient with respect to the allegation pertaining to her. Here, unlike with SCPO K.B., it is unknown when CPO S.C. opened the text message in question. Accordingly, I concur with the lead opinion that we should set aside and dismiss this specification.

Judge HARDY, with whom Judge MAGGS joins with respect to Part II, concurring in part and dissenting in part.

As relevant here, Congress has broadly criminalized any conduct by an enlisted servicemember that "treats with contempt or is disrespectful in language or deportment toward a warrant officer, noncommissioned officer, or petty officer, while that officer is in the execution of his office." Article 91, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 891 (2018). Absent any narrowing construction by the President, this broad language likely would proscribe Appellant's actions in this case. Nevertheless, the elements and explanation of Article 91, UCMJ, promulgated by the President in the *Manual for Courts-Martial, United States* (2019 ed.) (*Manual* or *MCM*), require that the accused perform his disrespectful act within the sight or hearing of the victim for the conduct to be criminal. *MCM* pt. IV, para. 17.b.(3)(c). Because the record contains no evidence that Appellant's disrespectful behavior occurred within the sight or hearing of the alleged victims, I would hold that the United States Coast Guard Court of Criminal Appeals (CGCCA) should be reversed as to Specifications 1, 2, and 4 of Charge I, and that the findings of guilty with respect to those three specifications should be set aside and dismissed.[1]

### I. The President's Elements to Article 91(3), UCMJ, Control the Analysis

The granted issue in this case asks whether Appellant's convictions under Article 91(3), UCMJ, were legally

---

[1] Putting aside the question whether an accused's conduct must be performed in the sight or hearing of the victims, I also agree with Chief Judge Ohlson that the elements and explanation of Article 91(3), UCMJ, impose a concurrency requirement on the offense, such that the conduct of an accused must occur when the target of his contempt or disrespect was in the execution of his office. *United States v. Brown*, __ M.J. __ , __ (9) (C.A.A.F. 2023). Because the Government introduced no evidence establishing whether the targeted petty officers in Specifications 2 and 4 of Charge I were in the execution of office when Appellant acted, I agree with Chief Judge Ohlson that the CGCCA should be reversed with respect to those two Specifications for this additional reason. *Id*. at __ (11).

insufficient because there is no evidence that his disrespectful behavior occurred "within the sight or hearing" of the victims. *MCM* pt. IV, para. 17.b.(3)(c). This so-called "presence" requirement does not appear in the text of Article 91(3), UCMJ, but rather is an element of the offense that the President has specified in the *Manual*. This raises the interesting question—briefed extensively by the parties—whether the President has the authority to narrow a statutory offense by adding elements that must be proven beyond a reasonable doubt beyond those requirements expressly stated by Congress in the text of the article.

In its briefs, the Government argues that we need only consider the text of Article 91(3), UCMJ, to determine the legal sufficiency of Appellant's convictions without any consideration of the President's elements presented in the *Manual*. The Government contends that the President's guidance—issued pursuant to an express delegation of authority from Congress in Article 36, UCMJ, 10 U.S.C. § 836 (2018), and through the President's inherent constitutional authority as commander-in-chief, U.S. Const. art. II, § 2, cl. 1—can be ignored unless it unambiguously narrows the scope of the offense's statutory language. The Government abandoned this line of reasoning at oral argument conceding that it must prove every element enumerated by the President in the *Manual* to convict a servicemember of an offense under the UCMJ.[2] In light of the Government's concession, it is no longer strictly necessary to answer this question to decide this case. Nevertheless, given the importance of this threshold question and the extensive briefing already presented in this case, I think it is worth considering whether the President's elements are relevant to the legal sufficiency of Appellant's challenged offenses.

Possibly the best support for the Government's argument comes from an opinion from our predecessor Court stating that "the President's rule-making authority does not extend to matters of substantive military criminal law." *Ellis v. Jacob*, 26 M.J. 90, 92-93 (C.M.A. 1988). Twenty years earlier, our predecessor had similarly

---

[2] Oral Argument at 30:06-32:34, *United States v. Brown* (C.A.A.F. Jan. 24, 2023) (No. 22-0249).

suggested that the President's elements may "be disregarded if they are 'no more than an attempted addition to the statute of something which is not there.'" *United States v. Margelony*, 14 C.M.A. 55, 57-58, 33 C.M.R. 267, 269-70 (1963) (quoting *United States v. Calamaro*, 354 U.S. 351, 359 (1957)). Although the language in those precedents might be interpreted as suggesting that the President lacks any authority to promulgate elements narrowing the scope of a statutory criminal offense (because doing so exceeds the scope of the delegation of authority made to the President by Congress in Article 36, UCMJ), I do not believe that that is the best reading of those cases.

I read those precedents as only holding that the President lacks the authority to create new criminal offenses or to expand the scope of the statutory offenses enacted by Congress. This reading has two benefits. First, it does not call into question the past seven decades of military justice practice during which the President's elements have defined how the government establishes guilt for crimes prosecuted under the UMCJ. And second, this reading is consistent with our precedent, where we have permitted the President to narrow—but not to expand—the applicable scope of the statutory UCMJ offenses. *See*, *e.g.*, *United States v. Jenkins*, 7 C.M.A. 261, 262, 22 C.M.R. 51, 52 (1956) (refusing to enforce the President's expansion of Article 83, UCMJ, to include inductees); *United States v. Rushlow*, 2 C.M.A. 641, 644, 10 C.M.R. 139, 142 (1953) (refusing to enforce the President's guidance that a contingent purpose to return qualifies as an intent to remain away permanently for the purpose of Article 85, UCMJ). But whether or not Article 36, UCMJ—or possibly the commander-in-chief clause of the Constitution—grants the President authority to promulgate additional elements to statutory UCMJ offenses, I believe that there is a greater constitutional concern that would prevent this Court from disregarding the President's guidance in the *Manual*.

This Court has long held that "[w]here the President's narrowing construction is favorable to an accused and is not inconsistent with the language of a statute, 'we will not disturb the President's narrowing construction, which is an

appropriate [e]xecutive branch limitation on the conduct subject to prosecution.'" *United States v. Guess*, 48 M.J. 69, 71 (C.A.A.F. 1998) (quoting *United States v. Davis*, 47 M.J. 484, 486-87 (C.A.A.F. 1998)). In my view, the deference the Court gives the President in these matters is not simply a courtesy but is also necessary to uphold fundamental principles of notice and due process.

The Supreme Court has explained that "[t]he essence of due process is the requirement that a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 348-49 (1976) (second alteration in original) (internal quotation marks omitted) (citation omitted). Accordingly, our predecessor Court recognized that "[a]n accused must be on notice that his conduct is unlawful and that the article fairly informs 'that particular conduct which he engaged in was punishable.'" *United States v. Guerrero*, 33 M.J. 295, 297 (C.M.A. 1991)) (quoting *Parker v. Levy*, 417 U.S. 733, 755 (1974)). Requiring the government to prove every element as enumerated and explained by the President is necessary to protect servicemembers' due process rights by ensuring that they bear no criminal liability for conduct that the President has publicly and officially deemed noncriminal in the *Manual*.

Servicemembers are justified in relying on the President's guidance for fair notice of what conduct is criminal under the UCMJ for two reasons. First, the President issued and updates the *Manual* via executive order pursuant to express statutory authority under Article 36, UCMJ.[3] When the President issues an executive order "pursuant to a mandate or a delegation of authority from Congress" that order has "the force and effect of laws." *Farmer v. Philadelphia Elec. Co.*, 329 F.2d 3, 7 (3d Cir. 1964); *see also Maryland Casualty Co. v. United States*, 251 U.S. 342, 349

---

[3] *See 2023 Amendments to the Manual for Courts-Martial, United States*, Exec. Order No. 14,103, 88 Fed. Reg. 50,535 (July 28, 2023) (updating the current version of the *1984 Manual*); *Manual for Courts-Martial, United States, 1984*, Exec. Order No. 12,473, 49 Fed. Reg. 17,152 (Apr. 13, 1984) (prescribing the *1984 Manual* and rescinding all previous editions).

(1920) (noting that it is a settled principle of law that "a regulation by a department of government, addressed to and reasonably adapted to the enforcement of an act of Congress . . . has the force and effect of law if it be not in conflict with express statutory provision"). Because Congress has delegated to the President the authority to prescribe regulations for courts-martial, and because all the actors in the military justice system are members of the executive branch to whom the President's executive order lawfully applies, the President's guidance is legally binding on the military justice system.[4]

Second, when the President enumerates elements in the *Manual*, he is informing the military community what conduct is criminal under the UCMJ pursuant to his inherent constitutional authority as commander-in-chief. The President's enumeration of criminal elements is an exercise of prosecutorial discretion that functions as a lawful order to commanders and trial counsel, that they must prove every element before an accused can be convicted of an offense by courts-martial. As the Government conceded at oral argument, see *supra* note 2 and accompanying text, it has no authority to deviate from the President's elements when charging servicemembers with crimes under the UCMJ. Servicemembers are thus fully justified, for notice and due process purposes, in relying on the President's

---

[4] One notable exception to this rule, of course, are the judges of this Court, who enjoy the constitutionally curious status of executive branch officers who are empowered to act independently of the President because they have statutory tenure protection. *See Humphrey's Ex'r v. United States*, 295 U.S. 602, 632 (1935) (holding that Congress may create executive branch agencies led by a group of principal officers removable by the President only for good cause); Article 142(c), UCMJ, 10 U.S.C. § 942(c) (2018). Although the scope of Congress's authority under *Humphrey's Ex'r* to create independent executive branch officers has recently come under increased scrutiny, this Court's constitutional status as a multimember panel of principal officers that performs a judicial function seems secure. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2199 (2020) (describing the limits of Congress's power to create independent executive branch entities).

lawful order to describe the scope of conduct considered criminal under the UCMJ.

The President's guidance in the *Manual* puts all servicemembers on notice of what conduct is proscribed and what must be proven to put their personal liberty in jeopardy. Even if this Court were eventually to decide that Article 36, UCMJ, does not authorize the President to promulgate elements for the UCMJ offenses, convicting a servicemember for conduct that fell outside the scope of conduct described by the President in the *Manual* would still violate the servicemember's fundamental due process rights because under the current state of the law, servicemembers are entitled to rely on the President's orders—as published in the *Manual*—until and unless those orders are declared to be unlawful.

## II. Legal Sufficiency of Appellant's Convictions Under Article 91(3)

I turn now to the granted question in this case, whether Appellant's challenged convictions under Article 91, UCMJ, were legally insufficient. Specification 1 alleged that Appellant engaged in disrespectful conduct "by *modifying* a digital photograph of Chief Petty Officer [J.D.] to include a depiction of male genitalia on his head and *distributing* it to the POLAR STAR Chief's Mess." (Emphasis added.) Specification 2 alleged that Appellant engaged in disrespectful conduct "by *modifying* a digital image of Chief Petty Officer [S.C.]'s high school yearbook photograph to include the phrase '[v]oted most likely to steal your bitch' and *distributing* it to the POLAR STAR Chief's Mess." (Second alteration in original.) (Emphasis added.) Specification 4 alleged that Appellant engaged in disrespectful conduct "by *sending* a digital image of a scantily clad male to the POLAR STAR Chief's Mess and alleging that the scantily clad male was the reason Senior Chief Petty Officer [K.B.] was unable to attend a Chief's Call, or words to that effect." (Emphasis added.) Applying the President's elements, the question presented can be broken down into two components. First, whether Appellant's disrespectful behavior was "used toward and within sight or hearing" of the named petty officers.' *MCM* pt. IV, para. 17.b.(3)(c). And second, whether those petty officers were "then in the

execution of office" when Appellant committed the disrespectful acts. *MCM* pt. IV, para. 17.b.(3)(e).

### A. The Elements of Article 91(3) Must Be Satisfied Simultaneously

I agree with Chief Judge Ohlson that the language of Article 91(3)'s elements mandates that those elements be satisfied simultaneously for the accused's conduct to be criminal, and therefore agree that Appellant's convictions as to Specifications 2 and 4 of Charge I should be reversed. *Brown*, __ M.J. at __ (9-11). I believe, however, that there is a more straightforward means of resolving this case under which Appellant's convictions as to Specifications 1, 2, and 4 of Charge I should be reversed.

### B. Appellant's Disrespectful Behavior Was Not Performed Within the Sight or Hearing of the Named Petty Officers

As applicable here, to convict Appellant of the charged Article 91(3) offenses, the Government was required to prove, inter alia: "[t]hat the accused did . . . certain acts" and "[t]hat such behavior . . . was used toward and within sight or hearing" of the named petty officers. *MCM* pt. IV, para. 17.b.(3)(b)-(c). The most straightforward meaning of the requirement that the disrespectful behavior must occur "within the sight or hearing" of a certain petty officer is that the accused must have committed disrespectful acts at a time when, and in a place where, the petty officer could see or hear the accused commit the disrespectful acts. In this case, the Government did not prove that Appellant committed the charged disrespectful acts—"modifying," "distributing," and "sending" photos and messages—at times when, and in places where, the named petty officers could see or hear Appellant commit these disrespectful acts. Therefore, the evidence did not show that these disrespectful acts occurred "within the sight or hearing" of the named petty officers.

To be sure, the disrespectful messages that Appellant sent did reach and were eventually viewed by the chief petty officers. But those disrespectful messages were the *product* of Appellant's disrespectful acts, not the acts of "modifying," "distributing," or "sending" with which

7

Appellant was charged. For these reasons, I find the evidence to be legally insufficient to prove Appellant guilty of disrespectful deportment in violation of Article 91(3), UCMJ, under the elements specified by the President.

This interpretation of Article 91(3), UCMJ's elements may seem overly strict, but I am unaware of any case before today in which this Court affirmed a finding that an accused was guilty of an offense under Article 91(3), UCMJ, where the accused engaged in disrespectful behavior at a time when, or in a place where, the disrespected warrant, noncommissioned, or petty officer could not see or hear that behavior. Moreover, as noted by Chief Judge Ohlson, "it is not the role of this Court to expand the reach of either statutory language passed by Congress or elements of the articles promulgated by the President in order to avoid anomalous or undesirable results." *Brown*, __ M.J. at __ n.8 (9 n.8). Nor do I mean to suggest that I believe—as Appellant argues—that the elements of Article 91(3), UCMJ, impose a physical presence requirement. Modern communications technology might bring an accused's conduct "within the sight or hearing" of the accused's intended victim. Nevertheless, when the government charges an accused with committing disrespectful *acts*—as it did in this case—the government must prove that those *acts* were committed "within sight or hearing" of the victim. *MCM* pt. IV, para. 17.b.(3)(b). Because the Government failed to do so in this case, the findings of guilty with respect to Specifications 1, 2, and 4 of Charge I are not legally sufficient.

### III. Conclusion

Because the record indicates that Appellant did not create or send the disrespectful text messages within the sight or hearing of any of the alleged victims, I would hold that his Article 91(3) convictions are not legally sufficient and reverse the decision of the CGCCA with respect to Specifications 1, 2, and 4 of Charge I.[5]

---

[5] In the alternative, I agree with Chief Judge Ohlson that Appellant's Article 91(3) convictions with respect to Specifications 2 and 4 of Charge I were not legally sufficient, and I would reverse the CGCCA with respect to those two specifications.